HENRY D. GRADSTEIN, ESQ. (SBN 89747)
*hgradstein@gradstein.com*
MARYANN R. MARZANO, ESQ. (SBN 96867)
*mmarzano@gradstein.com*
GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd., Suite 510
Los Angeles, CA 90048
Telephone: (323) 302-9488
Cell: (310) 489-6551

Attorneys for Plaintiffs
David Taban and Violet Taban,
as Trustees of the David Taban
and Violet Taban Living Trust

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| DAVID TABAN and VIOLET TABAN, as Trustees of THE DAVID TABAN AND VIOLET TABAN LIVING TRUST, <br><br> Plaintiffs, <br><br> vs. <br><br> QUESTCOR PHARMACEUTICALS, INC., a California corporation; DON M. BAILEY, an individual; MICHAEL H. MULROY, an individual; STEPHEN L. CARTT, an individual; DAVID YOUNG, an individual; and DOES 1 THROUGH 10, inclusive, <br><br> Defendants. | Case No.: **SACV13-0425** DOC (JPPx) <br><br> **COMPLAINT FOR:** <br><br> 1. **VIOLATION OF THE FEDERAL SECURITIES LAWS;** <br> 2. **FRAUD-INTENTIONAL MISREPRESENTATION; AND** <br> 3. **FRAUDULENT CONCEALMENT** <br><br> **DEMAND FOR JURY TRIAL** |

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

COMPLAINT

1   Plaintiffs DAVID TABAN and VIOLET TABAN, as Trustees of THE

2   DAVID TABAN AND VIOLET TABAN LIVING TRUST (collectively,

3   "Plaintiffs"), complain and allege against Defendants QUESTCOR

4   PHARMACEUTICALS, INC. ("Questcor" or the "Company"), DON M. BAILEY

5   ("Bailey"), MICHAEL H. MULROY ("Mulroy"), STEPHEN L. CARTT ("Cartt")

6   and DAVID YOUNG ("Young") (collectively, "Defendants"), as follows:

7   **NATURE OF THE ACTION**

8       1.      This is an action for violation of the federal securities laws and fraud

9   with respect to Plaintiffs' trading and sale of put options for Questcor common

10  stock between approximately April 26, 2011 and September 24, 2012, inclusive

11  (the "Trading Period"), against Questcor and certain of its officers and/or directors

12  for violations of the Securities Exchange Act of 1934 (the "1934 Act").  These

13  claims are asserted against Questcor and certain of its officers and/or directors who

14  made materially false and misleading statements during the Trading Period in press

15  releases, analyst conference calls, and filings with the U.S. Securities and Exchange

16  Commission ("SEC").

17      2.      Questcor is a biopharmaceutical company.  The Company's primary

18  product is H.P. Acthar Gel (Repository Corticotropin Injection) ("Acthar"), an

19  injectable drug that is approved by the U.S. Food and Drug Administration

20  ("FDA") for the treatment of nineteen (19) indications, including multiple

21  scelorosis ("MS"), a condition of the central nervous system; nephrotic syndrome, a

22  kidney condition; and infantile spasms, an epileptic condition affecting babies.

23      3.      Specifically, throughout the Trading Period, Defendants violated the

24  federal securities laws by disseminating false and misleading statements to the

25  investing public, including Plaintiffs, about the effectiveness of Acthar as a

26  treatment for MS and nephrotic syndrome, making it impossible for investors to

27  gain a meaningful or realistic understanding of the drug's prospects and market

28  success.  As a result of Defendants' false statements, Questcor's stock traded at

- 2 -

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1  artificially inflated prices during the Trading Period, reaching a high of $57.64 per

2  share on July 9, 2012.

3      4.      On September 19, 2012, Citron Research ("Citron") reported that

4  Aetna, Inc. ("Aetna"), one of the nation's largest insurers, had recently revised its

5  policy concerning Acthar, which would severely limit coverage of Questcor's

6  primary drug.  Aetna had engaged in a review of the 19 indications for which the

7  FDA had approved Acthar.  Based upon its findings, Aetna determined that clinical

8  research supported only one of the 19 indications.  In Aetna's clinical policy

9  bulletin issued in connection with its review, Aetna reported that studies suggested

10  that the drug is only "medically necessary" for West syndrome, a rare condition that

11  causes infantile spasms, and not for other indications, such as MS, that are treated

12  with steroids.  Typically, Aetna only reimburses for drugs when they are deemed

13  medically necessary.  According to an Aetna spokesperson, "'Our previous position

14  was that this was a last-resort treatment. . . . We now state that it is not medically

15  necessary because there is no clinical evidence that the drug is more effective than

16  steroids."'

17      5.      On this news, Questcor's stock plummeted $24.17 per share to close at

18  $26.35 per share on September 19, 2012, a one-day decline of 48% on high volume.

19      6.      Then, on September 24, 2012, Questcor announced in a Form 8-K

20  filed with the SEC that the U.S. government had initiated an investigation into the

21  Company's promotional practices.

22      7.      After this news, Questcor's stock dropped $11.05 per share to close at

23  $19.08 per share on September 24, 2012, a one-day decline of 37% on high volume.

24      8.      The true facts, which were known by the Defendants but concealed

25  from the investing public, including Plaintiffs, during the Trading Period, include,

26  but are not limited to, the following:

27      (a)      Questcor lacked clinical data and scientific evidence to support

28  the use of Acthar for indications other than infantile spasms, even as a "second-

- 3 -

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

line" therapy.

    (b)    Questcor had engaged in questionable tactics to promote the sale and use of Acthar in the treatment of MS and nephrotic syndrome, including, but not limited to, the use of studies that were inherently flawed and did not support the conclusions for which they were being used by Questcor's sales force.

    (c)    Questcor lacked a reasonable basis to make positive statements about the Company or its outlook, including statements about the effectiveness of and potential market growth for Acthar.

9.    As a result of Defendants' false statements, Questcor stock traded at artificially inflated levels during the Trading Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down 67% from their Trading Period high.

## JURISDICTION AND VENUE

10.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the 1934 Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question), Section 27 of the 1934 Act (15 U.S.C. §78aa) and 28 U.S.C. § 1367 (supplemental jurisdiction).

12.    Venue is proper in this District pursuant to Section 27 of the 1934 Act and 28 U.S.C. § 1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

13.    Questcor maintains its principal executive offices at 1300 North Kellogg Drive, Suite D, Anaheim, California 92807.  Certain of the acts and conduct complained of herein, including dissemination of materially false and misleading information to Plaintiffs, occurred in this District.

14.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1  including, but not limited to, the mails, interstate telephone communications and the

2  facilities of the national securities markets.

3                                              **PARTIES**

4          15.     Plaintiffs David Taban and Violet Taban, Trustees of the David Taban

5  and Violet Taban Living Trust, traded and sold put options for Questcor common

6  stock during the Trading Period as set forth in the accompanying certification,

7  incorporated by reference herein, and were damaged as a result of Defendants'

8  wrongdoing as alleged in this Complaint.

9          16.     Defendant Questcor is a biopharmaceutical company.

10          17.     Defendant Don M. Bailey ("Bailey") is, and at all relevant times was,

11  the Company's Chief Executive Officer ("CEO"), President and a director.  During

12  the Trading Period, defendant Bailey signed and/or caused to be filed with the SEC

13  documents that contained false and misleading statements as set forth herein,

14  including SEC Forms 10-Q and 10-K.  Defendant Bailey made various other false and

15  misleading statements during the Trading Period in press releases and on

16  conference calls, as set forth herein.  During the trading period, defendant Bailey

17  sold 440,000 shares of his Questcor stock for proceeds of over $17.7 million, while

18  in possession of material non-public information.

19          18.     Defendant Michael H. Mulroy ("Mulroy") is, and at all relevant times

20  was, the Company's Chief Financial Officer ("CFO"), Senior Vice President and

21  General Counsel and Corporate Secretary.  During the Trading Period, defendant

22  Mulroy signed and/or caused to be filed with the SEC documents that contained

23  false and misleading statements as set forth herein, including SEC Forms 10-Q

24  and 10-K.  Defendant Mulroy made various other false and misleading statements

25  during the Trading Period in press releases and on conference calls, as set forth

26  herein.

27          19.     Defendant Stephen L. Cartt ("Cartt") is, and at all relevant times was,

28  the Company's Chief Operating Officer ("COO") and has been since February

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

2012. Defendant Cartt previously served as Questcor's Chief Business Officer and Executive Vice President. During the Trading Period, defendant Cartt made various false and misleading statements in press releases and on conference calls, as set forth herein. During the Trading Period, defendant Cartt sold 505,509 shares of his Questcor stock for proceeds of over $16.2 million, while in possession of material non-public information.

20. Defendant David Young ("Young") is, and at all relevant times was, the Company's Chief Scientific Officer. During the Trading Period, defendant Young made various false and misleading statements during the Trading Period in press releases and on conference calls, as set forth herein. During the Trading Period, defendant Young sold 175,124 shares of his Questcor stock for proceeds of nearly $7.1 million, while in possession of material non-public information.

21. The defendants named above in Paragraphs 17-20 are referred to herein as the "Individual Defendants."

22. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Questcor's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them, but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

COMPLAINT

23.     On information and belief, defendants Does 1 through 10 (collectively, the "Doe Defendants") are individuals and business entities who have participated or assisted in the conduct alleged herein or are otherwise responsible therefor. The identity of these Doe Defendants presently is not and cannot be known to Plaintiffs, but Plaintiffs will seek leave of the Court to add them as named defendants when they are identified.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

24.     Defendants are liable for: (i) making false statements; and (ii) fraudulently concealing the true facts known to them about Questcor necessary to provide an honest context for the statements so as not to be misleading. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Questcor common stock was a success, as it: (i) deceived the investing public, including Plaintiffs, regarding Questcor's prospects and business; (ii) artificially inflated the price of Questcor common stock; (iii) caused Plaintiffs to trade and sell put options of Questcor at inflated prices; and (iv) permitted the officer and directors of Questcor to sell over 3.1 million shares of their Questcor stock at artificially inflated prices for proceeds of over $100 million.

## BACKGROUND

25.     Questcor is a single product company, with Acthar accounting for nearly all of its revenue. Acthar, a highly specialized, low-volume, premium-priced drug, was originally approved by the FDA in 1952. The injectable hormone has a broad label, as it has been approved by the FDA for use in 19 indications. Acthar is a first-line treatment for infantile spasms, a rare, terrible seizure disorder that affects around 1,500 babies a year in the U.S. Acthar was approved for the treatment of MS relapse in 1978. It was used extensively as a treatment for MS in the 1970s, but was largely abandoned in the 1980s after corticosteroids came on the market, as the powerful steroids proved to be a superior alternative to Acthar.

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

26.     Questcor acquired the rights to Acthar in 2001 for $100,000.  At the time, Acthar was almost exclusively being used to treat infantile spasms.  In 2007, Questcor filed an application with the FDA to obtain orphan drug status for Acthar for the treatment of infantile spasms.  The FDA grants orphan status to a drug that treats a disease affecting fewer than 200,000 people.  Orphan status provides a company with seven years of marketing exclusivity.  At the same time the Company filed its application with the FDA, Questcor raised the price of Acthar from $1,650 per vial to $23,000 per vial, a literally overnight increase of over 1300%.  As a result of the significant price increase, 2007 was the first year in the history of the drug that Acthar made money.  The FDA approved Questcor's orphan drug status application in October 2010.

27.     Soon after the Company enacted the tremendous price hike, Questcor embarked on an aggressive strategy to transform Acthar into a blockbuster drug.  Questcor' s sole strategic goal was to promote Acthar and expand the use of the drug for other indications, initially focusing on using Acthar for the treatment of MS beginning at the end of 2007, followed by nephrotic syndrome in the first quarter of 2011.  Questcor markets Acthar as a second line treatment for MS after patients are not responsive to steroids and markets Acthar as a first-line treatment for nephrotic syndrome.

28.     As a result of Questcor's new strategy, the Company has grown tremendously, with its net sales increasing from $49.8 million in 2007 to $509.3 million in 2012.  The main source of the Company's growth is the use of Acthar in the treatment of MS and nephrotic syndrome.  Currently, infantile spasms, the condition for which it received orphan drug status, accounts for only 6%-10% of the Company's revenues.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS
### ISSUED DURING THE TRADING PERIOD

29.     On April 4, 2011, Questcor issued a release announcing its preliminary

first quarter 2011 financial results. The release stated in part:

> New, paid prescriptions of H.P. Acthar® Gel (Acthar) for the treatment of exacerbations of multiple sclerosis (MS) during the quarter were greater than 500, up over 115% from the year ago period and up over 40% from the prior quarter.

* * *

> "The strong performance we saw late in the fourth quarter of 2010 has continued in the first quarter of 2011 and was driven by the increasing productivity of our recently expanded Acthar sales force. March showed significant growth in MS prescriptions and exceeded February's record performance by over 50%. In addition, we are pleased with the very early results from the efforts of our small dedicated Nephrology sales team. While we are very encouraged by the first quarter new prescription results, we note that prior sharp increases in sequential quarterly Acthar prescriptions have usually been followed by more modest sequential growth," said Don M. Bailey, President and CEO of Questcor Pharmaceuticals.

30.     As a result of this news, the market reacted favorably and sent the price of Questcor stock higher, closing on April 5, 2011 at $18 per share. This represented a one-day increase of more than $3 per share, or 20%.

31.     On April 26, 2011, Questcor issued a press release announcing its first quarter 2011 financial results. The Company reported net income of $11.2 million, or $0.17 diluted earnings per share ("EPS"), and net sales of $36.8 million for the first quarter of 2011. The release stated in part:

> The Company's financial performance was driven by a 120% year-over-year increase in the number of new paid prescriptions of H.P. Acthar® Gel (Acthar) for the treatment of multiple sclerosis (MS) exacerbations. In the first quarter, paid Acthar prescriptions for the

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

treatment of nephrotic syndrome (NS) increased to 18 while prescriptions for the treatment of infantile spasms (IS) were 89, which is within the historic range for IS.

"Our strategy to expand the sales force is clearly paying off," said Don M. Bailey, President and CEO of Questcor. "Paid MS prescriptions are up sharply from last quarter. March was a particularly strong month and this momentum has continued so far in April. We believe that Acthar is filling an increasingly important role in the treatment of exacerbations associated with MS and, looking forward, we expect to continue to grow sales in this important therapeutic area."

Mr. Bailey added, "We are also encouraged by the early positive results from our small, dedicated nephrology sales team, which initiated selling efforts at the beginning of March. The number of nephrologists who are using Acthar to treat patients with nephrotic syndrome is increasing."

32. In the release, defendants specifically highlighted a 2010 study as a basis for increasing NS sales, stating:

"During March, we initiated a limited selling effort in nephrology and a peer-reviewed journal published the first clinical data supporting the use of Acthar in the treatment of nephrotic syndrome. Our NS sales team has generated encouraging early Acthar prescription activity and we are now beginning to explore options for increasing our sales effort in this market," concluded Mr. Cartt.

33. After issuing its first quarter 2011 financial results on April 26, 2011, Questcor hosted a conference call for analysts, media representatives and investors. During the call, Defendants reiterated the record financial results reported in the Company's press release and defendant Mulroy discussed the Company's financial performance in depth. Defendants Bailey and Cartt further presented prepared

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1   statements at the conference call and represented as follows:

2       [BAILEY:]  In summary, we are off to a very good start this year

3   as we continue to execute our straightforward strategy to sell more

4   Acthar.  Our decision to expand the MS sales force is clearly paying off.

5   Also, our nephrotic syndrome sales force is having some early success.

6                                   * * *

7       We believe this MS sales performance reflects the strong, underlying

8   demand for Acthar.  This growth in demand is being driven by the increasing

9   productivity of our expanded sales force. We believe net sales in the MS

10  market are now about 60% of total Acthar net sales.

11                                  * * *

12      [CARTT:]  Our expanded promotional activities directed to

13  neurologists generated significant growth in Acthar prescriptions for MS

14  during the first quarter.  During the quarter we shipped a record 508 paid

15  Acthar prescriptions for the treatment of MS relapses.  This was an

16  increase of 120% over the year ago period and 44% over the previous

17  quarter.  We believe this performance is a strong signal that the sales

18  force expansion has gained traction in the MS market at a faster rate than

19  we expected.

20                                  * * *

21      Our promotional efforts are increasingly focused on two main

22  goals.  One, convincing an increasing number of prescribers about the

23  benefits of using Acthar with their patients and two, helping doctors,

24  nurses and others in their medical practice become more effective at

25  identifying potential Acthar patients.

26                                  * * *

27      In addition to increased promotion by our sales reps, Acthar sales

28  are benefiting from our sponsored physician speaker programs.  In these

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

COMPLAINT

programs existing Acthar prescribers present to small groups of physicians their experiences using Acthar and the published efficacy and safety data for Acthar in MS relapses.

When combined with follow up sales calls, these programs appear to be a key driver of our sales growth. Recently we've been significantly increasing the number of speaker programs being conducted and expect to continue doing so in the future.

34.   On April 27, 2011, Questcor filed with the SEC its Quarterly Report on Form 10-Q for the period ended March 31, 2011. The Company's Form 10-Q was signed by defendants Bailey and Mulroy and reaffirmed the Company's financial results previously announced on April 26, 2011. In addition, the Form 10-Q stated in part:

During the three months ended March 31, 2011, we achieved a significant increase in the number of prescriptions for Acthar to treat MS exacerbations, which was attributable to our expanded sales force calling on physicians who treat patients with MS.

\* \* \*

Research and development expenses were $3.0 million in the three months ended March 31, 2011, as compared to $2.7 million for the three months ended March 31, 2010. . . . Costs included in research and development also include costs associated with the funding of medical research projects to better understand the therapeutic benefit of Acthar in current and new therapeutic applications, product development efforts and compliance activities.

35.   On July 26, 2011, Questcor issued a press release announcing its second quarter 2011 financial results. The Company reported net income of $13.9 million, or $0.21 diluted EPS, and net sales of $46.0 million for the second quarter of 2011. The release stated in part:

- 12 -

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

A 147% year-over-year increase in the number of paid H.P. Acthar® Gel (Acthar) prescriptions for the treatment of multiple sclerosis (MS) exacerbations led to increased shipments of Acthar vials.  Paid Acthar prescriptions for the treatment of nephrotic syndrome (NS) also increased sharply in the quarter.  In addition, paid Acthar prescriptions for the treatment of infantile spasms (IS) were at the highest quarterly level since the third quarter of 2008.

"Clearly, Questcor had a terrific quarter," said Don M. Bailey, President and CEO of Questcor.  "Our focus on expanding the use of Acthar in the treatment of MS exacerbations drove our record second quarter financial performance.  Importantly, in spite of the rapid expansion in the use of Acthar for MS exacerbations, we believe that the prescriber base can continue to grow.  Accordingly, growing MS sales remains our number one priority.  Also, following our early success in nephrotic syndrome, we are immediately and substantially expanding our nephrology selling effort."

36.     After issuing its second quarter 2011 financial results on July 26, 2011, Questcor hosted a conference call for analysts, media representatives and investors. During the call, Defendants reiterated the record financial results reported in the Company's press release and defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey, Cartt and Young further presented prepared statements at the conference call and represented as follows:

[BAILEY:] The exceptional MS and NS sales growth along with a very good IS [infantile spasms], sales quarter naturally led to record Acthar vials shipped, record sales and record earnings. In addition today, we are announcing the fourth vertical market we aim to develop for Acthar, which is lupus.

* * *

- 13 -

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

[CARTT:] During the quarter we shipped a record 751 paid Acthar prescription for the treatment of MS relapses. This was an increase of 147% over the year-ago period, and 48% over the previous quarter. We believe this performance is a strong signal that the sales force continues to gain traction in the MS market at a faster rate than we expected. In addition to rapid growth, our trends at MS are all very good and indicate that we are building momentum in this key Acthar market.

\* \* \*

Our promotional efforts remain focused on two main goals. One, convincing an increasing number of prescribers about the benefits of using Acthar with their patients; and two, helping doctors, nurses and others in their medical practice become more effective at identifying the right patients for Acthar.

So, let's summarize. We are very pleased with the robust MS prescription growth during the quarter and expect continued growth during 2011 and into 2012 as a result of the continued sustained sales call activity. Our early prescription trends in nephrology are surprisingly strong and we are quickly expanding our sales capability in MS, which will result in a dramatic increase in the number of nephrologists that we can call on at the end of the third quarter, just about two months away.

\* \* \*

[BAILEY:] Our go-forward plan is extremely simple and remains to sell more Acthar. That is, gross sales in each of our key markets, MS, NS and IS, and then expand our commercial effort into other Acthar on-label markets and try to generate Acthar usage in those markets. In the second quarter we continued our momentum and had increasing sales levels combined with strong profit margins and substantial free cash flow. We are continuing to focus on MS sales. The commercial team is highly motivated,

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

highly incentivized and highly productive.

Based on positive nephrotic syndrome script growth, we are now increasing our focus on nephrotic syndrome sales and are expanding our MS selling efforts.  We are applying what we have learned during our four MS sales force increases, so that for nephrotic syndrome we can accelerate the commercial team buildout.

37.    The market reacted favorably to this announcement. For instance, on July 27, 2011, analyst Caris & Company issued a report entitled "NS Progress Looks Transformational, Lupus Entering Picture ... It's a Whole New Ballgame." The analyst provided a Buy rating and raised its priced target from $30 to $40 per share. Similarly, Oppenheimer & Co. issued a report entitled "Acthar Continues to Outpace Expectations; Increasing [price target] to $35" in which it stated "[w]e continue to expect robust sales growth for Acthar in MS flares and NS and therefore are increasing our Acthar sales estimates and EPS estimates." Defendants' false and misleading statements drove the stock price up $6.50 per share in a single day, or 25%, on heavy volume.

38.    On July 29, 2011, Questcor filed its Quarterly Report with the SEC on Form 10-Q for the period ended June 30, 2011.  The Company's Form 10-Q was signed by defendants Bailey and Mulroy and reaffirmed the Company's financial results previously announced on July 26, 2011.  In addition, defendants commented at length on the Company's "studies."  The Form 10-Q stated in part:

We also maintain a research and development program focused on gathering data to: (i) evaluate the proper use of Acthar for on-label indications; (ii) investigate other potential uses of Acthar that are not currently FDA approved indications; and (iii) improve our understanding of how Acthar works in the human body (pharmacology), and ultimately, its mechanism(s) of action in the disease states for which it is currently used, or may be used in the future:

- 15 -

* * *

Research and development expenses were $3.9 million in the three months ended June 30, 2011, as compared to $2.9 million for the three months ended June 30, 2010. . . . Costs included in research and development also include costs associated with the funding of medical research projects to better understand the therapeutic benefit of Acthar in current and new therapeutic applications, product development efforts and compliance activities.

We plan to continue our research and development efforts to explore the use of Acthar as a therapeutic alternative for the treatment of NS.  In 2010, we supported investigator-initiated studies in patients with idiopathic membranous nephropathy (on-label) and diabetic nephropathy (not on-label). Based on the results of these investigations, we have started a Phase IV dose response clinical trial for idiopathic membranous nephropathy and are developing a clinical protocol for a Company-sponsored study to evaluate the safety and efficacy of Acthar in treating diabetic nephropathy.

39.     On October 25, 2011, Questcor issued a press release announcing its third quarter 2011 financial results.  The Company reported net income of $22.9 million, or $0.35 diluted EPS, and net sales of $59.8 million for the third quarter of 2011.  The release stated in part:

"Questcor's strategy to sell more Acthar continues to generate increasing net sales and earnings," said Don M. Bailey, President and CEO of Questcor.  "Our commercial organization is steadily expanding the number of neurologists, nephrologists, and child neurologists prescribing Acthar.  We believe Acthar has the potential to benefit many more MS, NS, IS and possibly lupus patients in the future."

"Our 77 person Specialty Sales Force continues to drive expanded usage of Acthar as second-line therapy for MS exacerbations, a key Acthar

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

market," commented Steve Cartt, Executive Vice President and Chief Business Officer. "Furthermore, during the third quarter we completed the expansion of our Nephrology Sales Force from 5 to 28 representatives, with all new personnel being fully trained and making initial sales calls by October 1st. Despite the inherent disruption involved with this expansion, paid nephrotic syndrome Acthar prescriptions increased during the quarter. September was a particularly strong month for both MS and NS sales."

40.     After issuing its third quarter 2011 financial results on October 25, 2011, Questcor hosted a conference call for analysts, media representatives and investors. During the call, Defendants reiterated the record financial results reported in the Company's press release and defendant Mulroy discussed the Company's financial performance in depth. Defendants Bailey and Cartt further presented prepared statements at the conference call and represented as follows:

[CARTT:] [W]e shipped 886 paid Acthar prescription for the treatment of MS relapses during the third quarter of 2011. This was an increase of 4% over the year-ago period. In addition to strong script growth, other positive trends in our MS business indicate that we are building momentum in this key Acthar market.

* * *

Switching gears to the subject of new scientific data, several Acthar-related abstracts will be presented in November at the annual meeting of the America Society of Nephrology, or ASN, held this year in Philadelphia. These abstracts are available on ASN's website, www.asn-online.org. The new data provides further insight into the immune-modulating and other therapeutic properties of Acthar specifically relating to kidney disease.

We believe availability of this data provides further evidence for the direction [sic] action of Acthar on kidney disease. Importantly, the

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

first three abstracts shown may specifically enhance our near-term selling efforts in nephrology. Our emerging understanding of the apparent immune-modulating properties of Acthar is also beginning to encourage us to investigate the potentially broader therapeutic applications of Acthar in other inflammatory and autoimmune diseases, many of which are already on the product label for Acthar.

41.    On that same conference call, defendants were asked about insurance coverage for indications other than IS. Defendant Cartt re-assured investors about continued coverage of Acthar, confirming that coverage by insurers "remains very, very high across all our key therapeutic area[s]," stating:

[CARTT:] I think overtime payers have given a little more pushback, and this is over the last two to three years. I think we've gotten increasingly good at targeting the right types of patients and ensuring that the offices are giving the proper documentation for why Acthar is appropriate therapy for those patients.

So we're hitting the bull's-eye in terms of patient population that we're driving prescriptions for and we're supporting the offices better. We are getting better at working with the plans through our reimbursement hub. So while the insurance companies have over time been a little more resistant, we've been increasingly improving our whole approach to targeting the right kind of patients and supporting the offices.

So overall, it's kind of a draw between us and the payers and we expect that will be the case going forward: So, overall our coverage remains very, very high across all of our key therapeutic areas.

42.    On October 27, 2011, Questcor filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2011. The Form 10-Q was signed by defendants Bailey and Mulroy and reaffirmed the Company's financial results previously announced on October 25, 2011. In addition, the Form 10-Q

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1   stated in part:

2       We also maintain a research and development program focused on

3   gathering data to: (i) evaluate the proper use of Acthar for on-label

4   indications; (ii) investigate other potential uses of Acthar that are not

5   currently FDA approved indications; and (iii) improve our understanding of

6   how Acthar works in the human body (pharmacology), and ultimately, its

7   mechanism(s) of action in the disease states for which it is currently used, or

8   may be used in the future:

9                                        * * *

10      Research and development expenses were $4.2 million in the three

11  months ended September 30, 2011, as compared to $2.2 million for the three

12  months ended September 30, 2010.... Costs included in research and

13  development also include costs associated with the funding of medical

14  research projects to better understand the therapeutic benefit of Acthar in

15  current and new therapeutic applications, product development efforts and

16  regulatory compliance activities.

17                                       * * *

18      We plan to continue our research and development efforts to support

19  the use of Acthar as a therapeutic alternative for the treatment of NS. In

20  2010, we supported investigator-initiated studies in patients with idiopathic

21  membranous nephropathy and because of the results of these investigations,

22  we have started a Phase IV dose response clinical trial for idiopathic

23  membranous nephropathy.

24      43.    On January 11, 2012, *TheStreetSweeper.org* ("*StreetSweeper*"), a

25  website noted for unearthing corporate fraud in public companies, announced that it

26  had initiated a short position in Questcor. *StreetSweeper* further reported that it

27  intended to issue the first article in a two-part investigative series about Questcor in

28  the following week.  According to *StreetSweeper*:

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1     The first article raises serious questions about the aggressive

2  marketing practices that [Questcor] has used to generate explosive- but

3  potentially unsustainable - growth in prescriptions for its only drug while the

4  second story further examines QCOR's business practices,  while taking a

5  hard look at the leaders who have struck it rich as a result of the company's

6  controversial growth strategy.

7     44.   Thereafter, Questcor went to extensive lengths to refute the claims

8  raised by *StreetSweeper* and defend the Company's business practices.  As a result,

9  Questcor's stock continued to be artificially inflated.

10    45.   On January 11, 2012, Questcor issued a press release entitled

11  "Questcor Pharmaceuticals Issues Statement," which stated in part:

12     Questcor Pharmaceuticals, Inc. today announced it became aware that

13  an investor blog is preparing to issue a report regarding the Company's

14  marketing and business practices.  Questcor issued the following statement:

15     The Company believes that its marketing and business practices are

16  consistent with regulatory requirements and industry standard

17  practices. Questcor markets H.P. Acthar® Gel for the treatment of acute

18  exacerbations of multiple sclerosis (MS) in adults, the treatment of nephrotic

19  syndrome, and the treatment of infantile spasms in children under two years

20  of age.  The Company maintains a compliance program, which is led by an

21  experienced compliance officer and includes the active participation of

22  Questcor's executive management team.  Questcor attributes its success to the

23  ability of Acthar to potentially address the unmet medical need associated

24  with MS exacerbations and nephrotic syndrome.  The Company is committed

25  to providing access to Acthar to patients who need it, and marketing Acthar

26  in accordance with regulatory requirements and industry standard practices.

27  Questcor plans to speak with the publication to discuss the Company and its

28  marketing and business practices.

- 20 -

46.     On January 16, 2012, Questcor issued another release entitled "Questcor Pharmaceuticals Responds to Questions From Investor Blog" in which Questcor set forth its responses to questions provided to the Company by *TheStreetSweeper* on January 9, 2012.  The release stated in part:

Does Questcor offer any financial incentives to healthcare providers who use Acthar (such as price discounts or free samples of the drug)? If so, please explain.

Questcor Response: The Company does not provide financial incentives to doctors or other healthcare practitioners to prescribe Acthar. On rare occasions we have provided an Acthar sample to a very small number of doctors at their request. Providing product samples is of course a very common, accepted practice in the pharmaceutical industry.

* * *

How much scientific evidence does Questcor have to support Acthar as an effective treatment for NS? Please describe any modern clinical studies (such as the Bomback case review) that have been completed in this area so far.

Questcor Response: In addition to a formal approval from FDA, there is a growing body of more recent scientific data supporting the use of Acthar to treat proteinuria in nephrotic syndrome. For example, a retrospective case series publication by Bomback et al. which included a review of treatment results for patients treated with Acthar via prescription showed that in a subset of 10 patients with nephrotic syndrome due to idiopathic membranous nephropathy, 80% achieved a complete or partial remission of proteinuria. More recently, at the 44th Annual Meeting of the American Society of Nephrology in November 2011, Boston University Assistant Professor of Medicine Dr. Laurence H. Beck, Jr., M.D., Ph.D. presented results from a study which found that Acthar may induce a remission of proteinuria in

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

patients with nephrotic syndrome due to idiopathic membranous nephropathy by suppressing production of antibodies to the phospholipase A2 receptor. Separately, results from a prospective clinical study at Columbia University conducted by Appel et al., were presented at the 2011 American Society of Nephrology Annual Meeting. This study found that 47% (7 of 15) of patients suffering from nephrotic syndrome due to various etiologies and who were unsuccessfully treated with one or more other therapies were either partial or complete responders to Acthar treatment as defined by the level of proteinuria.  Nonetheless, the Company has been clear in warning investors of the limited scientific evidence in this area, as it did in its most recent Annual Report on Form 10-K, as follows:

"There is limited data on the efficacy of Acthar in the treatment of nephrotic syndrome. It is unclear what amount of clinical or other data physicians will require prior to deciding whether or not to use Acthar in the treatment of nephrotic syndrome."

\* \* \*

Please describe any past/current financial arrangements between Questcor and Bomback.

Questcor Response: Questcor has no current financial arrangements with Dr. Bomback . As Questcor was learning about the nephrology field and beginning to speak with nephrologists about Acthar, Dr. Bomback was a consultant to the Company with financial arrangements that were within industry norms.

\* \* \*

At this point in the conversation, Michael Mulroy, Questcor's Chief Compliance Officer, made the following statement: "In light of StreetSweeper's unclear background, motives and tactics, Questcor does not intend to engage in an ongoing dialog with StreetSweeper and makes no

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

COMPLAINT

commitment to respond to any further questions.  We believe that substantially all of the information requested in StreetSweeper's questions is already in the public domain. We take our marketing and business practices very seriously. Questcor has a standard compliance program. I am the Chief Compliance Officer and we have another compliance officer within the Company with 10 years of pharmaceutical compliance experience whose sole job is to design and execute our ongoing compliance efforts. We are in substantial compliance with the PhRMA Code on Interactions with Healthcare Professionals.  If we become aware of any unacceptable practices from outside parties or our normal ongoing compliance program we will of course deal with any such matters in a responsible manner."

47.    On February 3, 2012, Questcor issued a release announcing its preliminary fourth quarter and full year 2011 financial results.  The release reiterated that Questcor "committed to providing access to Acthar to patients who need it, and marketing Acthar in accordance with regulatory requirements and industry standard practices."

48.    On February 22, 2012, Questcor issued a press release announcing its fourth quarter and full year 2011 financial results.  The Company reported net income of $31.6 million, or $0.48 diluted EPS, and net sales of $75.5 million for the fourth quarter of 2011.  Additionally, the Company reported net income of $79.6 million, or $1.21 diluted EPS, and net sales of $218.2 million for fiscal year 2011.  The release stated in part:

"Net sales growth in the fourth quarter was driven by the increasing numbers of physicians who are recognizing the potential for Acthar to help patients with MS and NS," said Don M. Bailey, President and CEO of Questcor.  "We are particularly encouraged by the growing number of physicians who recognize the therapeutic value of Acthar in their practices, especially for those patients who have not adequately responded to other

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

treatments.  At the same time, we are continuing to build our understanding of the potential immune-modulating properties of Acthar, and are considering how best to study the broader possible therapeutic applications in other inflammatory and autoimmune diseases, many of which are already in the list of approved indications on the Acthar label."

49.    After issuing its fourth quarter and full year 2011 financial results on February 22, 2012, Questcor hosted a conference call for analysts, media representatives and investors.  During the call, Defendants reiterated the record financial results reported in the Company's press release and defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey, Cartt and Young further presented prepared statements at the conference call and represented as follows:

[BAILEY:]  As we look ahead to 2012 and beyond, we believe we can sustainably grow our Business due to three key factors.  First, Acthar provides benefits to many difficult to treat patients not responding to other treatments.  Second, our market penetration in terms of the total number of neurologists and nephrologists prescribing Acthar, while growing, remains relatively small.  And third, we have assembled an excellent, experienced commercial team to pursue our growth plan.  Our focus remains on helping patients with serious, difficult to treat medical conditions.

* * *

A key priority of ours continues to be educating both physicians and patients about how Acthar is a viable treatment option for MS exacerbations or relapses, particularly in those patients not well served by steroids, which are generally considered first line therapy by most neurologists.  This focus drove our year-over-year increase in the number of paid Acthar prescriptions for MS.  In the fourth quarter of 2011, there were 945 paid and shipped Acthar MS prescriptions, up from 354 scripts in the fourth quarter of 2010.

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

This is a 167% year-over-year increase.  There were several factors behind this growth- positive patient outcome; increasing awareness among neurologists about how best to incorporate Acthar into their practices; continued excellent Acthar insurance coverage for MS relapses; and the increase in productivity of our MS commercial team - all combined to generate this growth.

\* \* \*

We believe that because Acthar provides real and substantial benefits to many patients who would otherwise continue to suffer the effects of serious, difficult-to-treat disorders, our growth should be sustainable.  We are expanding the Organization and associated infrastructure to address the significant growth opportunities in front of us.  At the same time, we are off to a good start to 2012, with January MS, NS, and IS paid prescription each having a good month.

50.    Also on February 22, 2012, Questcor filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2011.  The Form 10-K was signed by defendants Bailey and Mulroy and reaffirmed the Company's financial results previously announced. In addition, the Form 10-K stated in part:

We maintain a research and development program focused on gathering data to: (i) evaluate the use of Acthar for certain on-label indications; (ii) investigate other potential uses of Acthar for indications not currently FDA approved; and (iii) expand our understanding of how Acthar works in the human body (pharmacology), and ultimately, its mechanism(s) of action in the disease states for which it is currently used, or may be used in the future:

\* \* \*

Research and development expenses were $16.8 million in 2011, as compared to $10.9 million in 2010 and $9.7 million in 2009.... Costs

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1   included in research and development also include costs associated with the

2   funding of medical research projects to expand our knowledge of the

3   therapeutic benefit of Acthar in current and new therapeutic applications,

4   product development efforts and regulatory compliance activities.

5   51.   On April 24, 2012, Questcor issued a press release announcing its first

6   quarter 2012 financial results.  The Company reported net income of $38.5 million,

7   or $0.58 diluted EPS, and net sales of $96.0 million for the first quarter of 2012.

8   The release stated in part:

9   "While our substantial NS commercial effort only began in the fourth

10   quarter of 2011, the value of NS shipped prescriptions now exceeds that of

11   MS," said Don M. Bailey, President and CEO of Questcor.  "This faster-than-

12   expected NS growth drove us to further expand the NS commercial effort

13   prior to the additional expansion of our MS commercial team."  At the same

14   time, we continue to increase our investment in efforts to learn about the

15   possible therapeutic applications of Acthar in other inflammatory and

16   autoimmune diseases as well as increase investments in our management

17   systems, internal control, and compliance infrastructure."

18   * * *

19   "We have been expanding our scientific efforts and R&D investments

20   in Acthar, and expect that we will continue to increase spending to support

21   Questcor's future growth," commented Dr. David Young, Chief Scientific

22   Officer.

23   52.   After issuing its first quarter 2012 financial results on April 24, 2012,

24   Questcor hosted a conference call for analysts, media representatives and investors.

25   During the call, Defendants reiterated the record financial results reported in the

26   Company's press release and defendant Mulroy discussed the Company's financial

27   performance in depth.  Defendants Bailey, Cartt and Young further presented

28   prepared statements at the conference call and represented as follows:

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1  [BAILEY:] Questcor's unconventional but simple business model
2  continues to produce excellent financial results.  Shift files, net sales and
3  earnings were all up well over 100% year-over-year.  We continue to expand
4  nephrologist and neurologist awareness of patient benefits from Acthar, and
5  as a result paid prescriptions continue to increase.  Driving our growth in the
6  first quarter was the strong increase in paid prescriptions written by
7  nephrologists to treat patients with nephrotic syndrome, a serious kidney
8  ailment.  After a successful pilot program, we stepped up our nephrology
9  commercial effort last October.  The expected revenues from nephrotic
10  syndrome prescriptions are accelerating to the point that, by our calculation,
11  nephritic syndrome scrip value now exceeds MS.

12  * * *

13  [CARTT:]  Insurance reimbursements for Acthar in nephrotic
14  syndrome continues to be very good, with more than 85% of private
15  insurance prescriptions covered.  We attribute this continued strong coverage
16  to the severity of the health outcome if nephrotic syndrome is not adequately
17  treated, coupled with the fact that Acthar is indicated and approved in this
18  condition, and there are few other treatment options. Further supporting both
19  coverage and prescribing activity is the ongoing flow of positive results
20  coming from the various studies we are funding.  In fact, data from one study
21  at the University of Toronto, is being presented just this week at the
22  Canadian nephrology society annual meeting.  This particular study found
23  that about two-thirds of patients with nephrotic syndrome due to idiopathic
24  membranous nephropathy, had their proteinuria drop by 50% or more, due to
25  Acthar treatment.

26  * * *

27  [YOUNG:]  As noted by the newest research analyst to cover
28  Questcor, Acthar can truly be considered a pipeline within a drug.  While

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

quite rare, there are, in effect, few other successful examples of the type of product. Soliris and Botox come to mind, for example. We have a significant opportunity with Acthar to expand use from our three existing markets that Steve just discussed to other markets that are part of the list of 19 approved on-label indications. In addition, as we've been learning more about the pharmacology of Acthar, including how and why Acthar acts differently than steroids, there are many other new indications with unmet medical needs, where we and others believe Acthar could provide a significant clinical benefit. Currently, we have approximately company-sponsored pre-clinical and clinical studies ongoing, and are supporting around 20 ongoing investigator-initiated studies.

53.     On April 26, 2012, Questcor filed with the SEC its Quarterly Report on Form 10-Q for the period ended March 31, 2012. The Form 10-Q was signed by defendants Bailey and Mulroy, and reaffirmed the Company's financial results previously announced on April 24, 2012. In addition, the Form 10-Q stated in part:

We maintain a research and development program focused on gathering data to: (i) evaluate the use of Acthar for certain on-label indications; (ii) investigate other potential uses of Acthar for indications not currently FDA approved; and (iii) expand our understanding of how Acthar works in the human body (pharmacology), and ultimately, its mechanism(s) of action in the disease states for which it is currently used, or may be used in the future:

* * *

Research and development expenses were $5.7 million in the three months ended March 31, 2012, as compared to $3.0 million for the three months ended March 31, 2011.... Costs included in research and development also include costs associated with the funding of medical research projects to better understand the therapeutic benefit of Acthar in current and new

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

therapeutic applications, product development efforts and regulatory compliance activities.

54.     On July 9, 2012, Questcor's stock reached its Trading Period high of $57.64 per share.

55.     On July 10, 2012, Citron issued an in-depth research report regarding Questcor.  Citron expanded on the *StreetSweeper* articles and further raised concerns about the Company's marketing strategy and a possible generic threat to Acthar.  The report discussed the competitive landscape for Acthar and was critical of the Company's assertions that there were significant barriers to entry into the market.  Citron further questioned whether there was credible scientific data to support Questcor's aggressive strategy to expand the use of Acthar for indications other than infantile spasms.  In addition, the research report analyzed the Company's marketing expenses and questioned how the drug was being marketed to doctors.  The Citron report further condemned Questcor for the lack of any meaningful research and development being engaged in by the biopharmaceutical company.  The report noted: "***Just the insider selling over the last year represents more cash than Questcor has spent on research and development over its entire lifespan.***"  The research report was not only critical of the amount of insider selling over the past year but it was also critical about its timing given the Company was buying back large amounts of Company stock at the same time the insiders were selling their shares.

56.     Despite the serious allegations raised in the Citron report, Questcor continued to refute the claims and portrayed the claims as being made by a short seller.  As a result, Questcor's stock continued to be artificially inflated.

57.     On July 24, 2012, Questcor issued a press release announcing its second quarter 2012 financial results.  The Company reported net income of $41.5 million, or $0.65 diluted EPS, and net sales of $112.5 million for the second quarter of 2012.  The release stated in part:

- 29 -

"In the second quarter, we surpassed $100 million in quarterly net sales for the first time in our history," said Don M. Bailey, President and CEO of Questcor. "Our strong financial results were driven by increasing usage of Acthar among nephrologists and neurologists. With the expansion of our Nephrology Sales Force now complete, the expansion of our Neurology Sales Force nearing completion, and the initial detailing effort of a small sales force in Rheumatology just getting started, we are optimistic about the potential for Acthar to help an increasing number of patients with serious, difficult-to-treat autoimmune and inflammatory disorders."

58.     After issuing its second quarter 2012 financial results on July 24, 2012, Questcor hosted a conference call for analysts, media representatives and investors. During the call, Defendants reiterated the record financial results reported in the Company's press release and defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey, Cartt and Young further presented prepared statements at the conference call and represented as follows:

[BAILEY:]  We made significant progress with our business in the last three months. Financial performance again improved.  We almost doubled the number of shipped vials in the quarter, more than doubled net sales, and tripled earnings from the year-ago quarter.  Paid scripts increased for both nephrotic syndrome and MS.  We expanded two sales forces and started building a third sales force in Rheumatology, using the same formula that worked so well with MS and nephrotic syndrome.  And, we also made good progress in both our science and compliance programs.

* * *

[CARTT:]  Very importantly, we often hear anecdotally that Acthar treatment is producing positive results for patients.  This is not always the case, of course; not everyone responds.  But, clearly, many patients are benefiting significantly from this drug, and there are few other treatment

- 30 -

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

options available.  All these factors are contributing to the rapid increase in Acthar usage in nephrotic syndrome.

* * *

Our year-over-year growth in MS paid scripts is due to positive patient outcomes, increasing awareness about how Acthar can help patients who are not fully benefiting from other therapies, continued excellent Acthar insurance coverage for MS relapse, and the increasing productivity of our MS commercial team.

* * *

[YOUNG:]  As you can see by our operating results reported in today's press release, we have been increasing our investment in research and development to better understand the unique immunomodulator and anti-inflammatory properties of Acthar Gel.  Our subjects- our objectives are to produce additional supporting data for the commercial team for onlabel indications and to expand our Acthar Gel used through FDA beyond current on-label indications.  Surprisingly, previous owners of Acthar Gel in the pharmaceutical industry in general have not invested in ACTH-based research.  Therefore, there are many research areas that still need to be assessed by our R&D group in order to better understand ACTH in the clinical role of Acthar Gel.

* * *

In summary, I'd like to bring you back to my initial topic on R&D expansion.  As we have previously reported, our R&D efforts have been and are continuing to focus on three areas.  First, producing additional supporting data for the commercial team for on-label indications.  Second, expanding Acthar Gel use beyond the existing on-label indications and following FDA processes.  And third, our greatest priority, better understanding the unique chemical, biological, and clinical characteristics of Acthar Gel.  Our research

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

results from this third area, thus far, suggest that developing a generic drug for Acthar Gel is very challenging.  All three areas of research are intended to advance the science of Acthar Gel in order to further help patients with devastating autoimmune and inflammatory diseases.

59.     On July 25, 2012, Questcor filed with the SEC its Quarterly Report on Form 10-Q for the period ended June 30, 2012. The Form 10-Q was signed by defendants Bailey and Mulroy and reaffirmed the Company's financial results previously announced on July 24, 2012.  In addition, the Form 10-Q stated in part:

In the quarter ended June 30, 2012, our expanded Nephrology Sales Force effort resulted in 314 new, paid NS prescriptions, a significant increase over the 45 new, paid NS prescriptions in the quarter ended June 30, 2011. During the three months ended June 30, 2012, the number of new, paid prescriptions for Acthar to treat MS exacerbations increased to 1,110 from 751 in the quarter ended June 30, 2011, which was attributable to increased physician awareness of the therapeutic role of Acthar.

* * *

We maintain a research and development program focused on gathering data to: (i) evaluate the use of Acthar for certain on-label indications; (ii) investigate other potential uses of Acthar for indications not currently FDA approved; and (iii) expand our understanding of how Acthar works in the human body (pharmacology), and ultimately, its mechanism(s) of action in the disease states for which it is currently used, or may be used in the future:

* * *

Research and development expenses were $8.5 million in the three months ended June 30, 2012, as compared to $3.9 million for the three months ended June 30, 2011.... Costs included in research and development also include costs associated with the funding of medical research projects to

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1   better understand the therapeutic benefit of Acthar in current and new

2   therapeutic applications, product development efforts and regulatory

3   compliance activities.

4       60.    On September 19, 2012, Citron reported that Aetna, one of the nation's

5   largest insurers, had recently revised its policy concerning Acthar, which would

6   severely limit coverage of Questcor's primary drug.  Aetna had engaged in a review

7   of the 19 indications for which the FDA had approved Acthar.  Based upon its

8   findings, Aetna decided that clinical research supported only one of the 19

9   indications.  In Aetna's clinical policy bulletin issued in connection with its review,

10  Aetna reported that studies suggested that the drug is only "medically necessary"

11  for West syndrome, a rare condition that causes infantile spasms, and not for other

12  indications, such as MS, that are treated with steroids.  Aetna generally only

13  reimburses for drugs when they are deemed medically necessary.  According to an

14  Aetna spokesperson, "Our previous position was that this was a last-resort

15  treatment. . . . We now state that it is not medically necessary because there is no

16  clinical evidence that the drug is more effective than steroids. "

17      61.    On this news, Questcor's stock plummeted $24.17 per share to close at

18  $26.35 per share on September 19, 2012, a one-day decline of nearly 48% on high

19  volume.

20      62.    Subsequently, on September 19, 2012, Questcor issued a press release

21  entitled "Questcor Comments on Insurance Policy Bulletin," which stated in part:

22      The Company is continuing to review the Clinical Policy Bulletin

23  related to Acthar from Aetna Inc. ("Aetna").  Currently, the Company does

24  not believe that the bulletin represents a material change in insurance

25  coverage for Acthar by Aetna.  During 2012, Aetna has accounted for

26  approximately 5% of the Company's shipped prescriptions for Acthar.  Based

27  on its current assessment of the Clinical Policy Bulletin, the Company does

28  not believe that the bulletin will have a material impact on the Company's

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1  results of operations.

2      63.   Then, on September 24, 2012, Questcor announced in a Form 8-K

3  filed with the SEC that the U.S. government had initiated an investigation into the

4  Company's promotional practices.

5      64.   After this news, Questcor's stock dropped $11.05 per share to close at

6  $19.08 per share on September 24, 2012, a decline of 37% on high volume.

7      65.   The true facts, which were known by the Defendants but fraudulently

8  concealed from the investing public, including Plaintiffs, during the Trading Period,

9  include, but are not limited to, the following:

10      (a)   Questcor lacked clinical data and scientific evidence to support

11  the use of Acthar for indications other than infantile spasms, even as a "second-

12  line" therapy.

13      (b)   Questcor had engaged in questionable tactics to promote the sale

14  and use of Acthar in the treatment of MS and nephrotic syndrome, including, but

15  not limited to, the use of studies that were inherently flawed and did not support the

16  conclusions for which they were being used by Questcor's sales force.

17      (c)   Questcor lacked a reasonable basis to make positive statements

18  about the Company or its outlook, including statements about the effectiveness of

19  and potential market growth for Acthar.

20      66.   As a result of Defendants' false statements and concealment of the true

21  facts known to them about Questcor necessary to provide an honest context for their

22  statements not to be misleading, Questcor stock traded at artificially inflated levels

23  during the Trading Period.  However, after the above revelations seeped into the

24  market, the Company's shares were hammered by massive sales, sending them

25  down 67% from their Trading Period high.

26                           **LOSS CAUSATION**

27      67.   During the Trading Period, as detailed herein, Defendants made false

28  and misleading statements and concealed the true facts known to them about

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

Questcor which were necessary to provide an honest context for their statements not to be misleading. Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Questcor common stock and operated as a fraud or deceit on Plaintiffs, as traders of put options of Questcor, by misrepresenting the Company's business and prospects. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Questcor common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of Plaintiffs' trading and sale of put options during the Trading Period, the David Taban and Violet Taban Living Trust suffered economic loss in the approximate amount of $5 million compensable under the federal securities laws.

## NO SAFE HARBOR

68.     Questcor's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Trading Period were ineffective to shield those statements from liability.

69.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Questcor who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

## COUNT I

### For Violation of Section 10(b) of the 1934 Act and Rule 10b-5
### Promulgated Thereunder
### Against All Defendants

70.     Plaintiffs repeat and reallege the allegations set forth in the preceding Paragraphs 1 through 69 as if fully set forth herein.

71.     During the Trading Period, Defendants disseminated to the public and/or approved of knowingly false and misleading statements as alleged above, and intentionally concealed the true facts necessary to provide an honest context for their public statements so that such statements would not be misleading.

72.     Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs as a seller of put options during the Trading Period.

73.     Plaintiffs have suffered damages in that, in reliance on Defendants' misrepresentations and the integrity of the market, they traded and sold put options for Questcor common stock at artificially inflated prices.  Plaintiffs would not have sold the put options at the prices they sold, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' fraudulent conduct.  As a direct and proximate consequence of Defendants' fraudulent conduct, the David Taban and Violet Taban Living Trust was damaged in the approximate amount of $5 million, according to proof at trial.

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

COMPLAINT

## COUNT II
### For Violation of Section 20(a) of the 1934 Act
### Against Defendants Bailey, Mulroy, Cartt and Young

74.     Plaintiffs repeat and reallege the allegations set forth in the preceding Paragraphs 1 through 73 as if fully set forth herein.

75.     The Individual Defendants acted as controlling persons of Questcor within the meaning of Section 20(a) of the 1934 Act.  By virtue of their high-level positions within the Company providing them with direct and supervisory involvement in its day-to-day operations, ownership of Questcor stock, participation in bi-weekly senior leadership meetings, awareness of the Company's finances and operations as demonstrated by their public statements made on behalf of the Company, and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power and authority to influence and control, directly or indirectly, the decision making of the Company, including the manner and timing of the buyback and the content and dissemination of the various statements identified herein which Plaintiffs contend are false and misleading.  The Individual Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements, alleged by Plaintiffs to be false and misleading, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the 1934 Act for the approximate $5 million in damages suffered by the David Taban and Violet Taban Living Trust, according to proof at trial.

## COUNT III
### For Fraud – Intentional Misrepresentation
### Against All Defendants (California Law)

76.     Plaintiffs repeat and reallege the allegations set forth in the preceding

- 37 -

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

COMPLAINT

1    Paragraphs 1 through 75 as if fully set forth herein.

2        77.    During the Trading Period, Defendants disseminated to the public

3    and/or approved of knowingly false and misleading statements as alleged above,

4    and intentionally concealed the true facts necessary to provide an honest context for

5    their public statements so that such statements would not be misleading.

6        78.    Defendants disseminated said false and misleading statements with the

7    intent to deceive the investing public, including Plaintiffs, and induced Plaintiffs to

8    trade and sell their put options during the Trading Period.

9        79.    Defendants knew their false and misleading statements were in fact

10   false and misleading, or did not believe them to be true, or did not reasonably

11   believe them to be true when made.  The true facts, which were known by the

12   Defendants but concealed from the investing public, including Plaintiffs during the

13   Trading Period, include, but were not limited to, the following:

14           (a)    Questcor lacked clinical data and scientific evidence to support

15   the use of Acthar for indications other than infantile spasms, even as a "second-

16   line" therapy.

17           (b)    Questcor had engaged in questionable tactics to promote the sale

18   and use of Acthar in the treatment of MS and nephrotic syndrome, including, but

19   not limited to, the use of studies that were inherently flawed and did not support the

20   conclusions for which they were being used by Questcor's sales force.

21           (c)    Questcor lacked a reasonable basis to make positive statements

22   about the Company or its outlook, including statements about the effectiveness of

23   and potential market growth for Acthar.

24       80.    At the time these false and misleading statements were made by

25   Defendants, Plaintiffs was unaware of their falsity and believed them to be true.

26   Had Defendants not made the misrepresentations alleged herein, Plaintiffs would

27   not have traded and sold put options during the Trading Period.

28       81.    Plaintiffs justifiably relied on the misrepresentations of facts made by

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

Defendants by trading and selling put options during the Trading Period.

82. Plaintiffs' reliance on Defendants' misrepresentations as alleged herein was a substantial factor in causing harm to the David Taban and Violet Taban Living Trust.

83. As a direct and proximate consequence of Defendants' fraudulent conduct, the David Taban and Violet Taban Living Trust was damaged in the approximate amount of $5 million, according to proof at trial.

84. In doing the acts herein alleged, Defendants acted with malice, oppression, and fraud in conscious disregard of Plaintiffs' rights, so as to justify an award of exemplary and punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in similar conduct.

## COUNT IV
### For Fraudulent Concealment
### Against All Defendants (California Law)

85. Plaintiffs repeat and reallege the allegations set forth in the preceding Paragraphs 1 through 84 as if fully set forth herein.

86. During the Trading Period, Defendants disseminated to the public and/or approved of knowingly false and misleading statements as alleged above, and Defendants intentionally concealed the material facts necessary to make such public statements, in light of the circumstances under which they were made, not misleading.

87. Defendants engaged in the fraudulent concealment alleged above with the intent to deceive the investing public, including Plaintiffs, during the Trading Period.

88. The true facts, which were known by the Defendants but fraudulently concealed from the investing public, including Plaintiffs, during the Trading Period, include, but were not limited to, the following:

    (a)    Questcor lacked clinical data and scientific evidence to support

- 39 -

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

the use of Acthar for indications other than infantile spasms, even as a "second-line" therapy.

(b)    Questcor had engaged in questionable tactics to promote the sale and use of Acthar in the treatment of MS and nephrotic syndrome, including, but not limited to, the use of studies that were inherently flawed and did not support the conclusions for which they were being used by Questcor's sales force.

(c)    Questcor lacked a reasonable basis to make positive statements about the Company or its outlook, including statements about the effectiveness of and potential market growth for Acthar.

89.    Disclosure of these true facts was necessary to make Defendants' public statements alleged above, in light of the circumstances under which they were made, not misleading.  Plaintiffs were unaware of these true facts and justifiably believed Defendants' false and misleading public statements to be true.  Without the benefit of the true facts Defendants' fraudulently concealed from them, Plaintiffs reasonably were induced to trade and sell put options during the Trading Period.  Had Defendants disclosed the true facts alleged above, Plaintiffs would not have undertaken such action.

90.    As a direct and proximate result of Defendants' fraudulent concealment, the David Taban and Violet Taban Living Trust has been damaged in the approximate amount of $5 million according to proof at trial.

91.    In doing the acts herein alleged, Defendants acted with malice, oppression and fraud in conscious disregard of Plaintiffs' rights, so as to justify an award of exemplary and punitive damages in an amount appropriate to punish Defendants, and to deter others from engaging in similar conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for Judgment as follows:

1.    For compensatory damages in favor of the David Taban and Violet Taban Living Trust in the approximate amount of $5 million according to proof at

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

trial, including interest thereon;

2.     Reasonable costs and attorneys' fees incurred in this action as permitted by law;

3.     Punitive damages in an amount sufficient to punish Defendants and to deter others from engaging in similar conduct; and

4.     For such other and further relief as the Court deems just and proper.

**<u>JURY DEMAND</u>**

Plaintiffs hereby demand a trial by jury.

Dated: March 13, 2013          GRADSTEIN & MARZANO, P.C.
                               HENRY D. GRADSTEIN
                               MARYANN R. MARZANO


                               By: _____
                                      HENRY D. GRADSTEIN

                                    Attorneys for Plaintiffs
                               David Taban and Violet Taban, as Trustees
                               of the David Taban and Violet Taban Living
                               Trust

- 41 -

COMPLAINT

## CERTIFICATION OF NAMED PLAINTIFFS
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws against Defendants Questcor Pharmaceuticals, Inc., et al., that:

Plaintiffs have reviewed the initial complaint filed in this action.

Plaintiffs did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiffs' counsel or in order to participate in any private action under the federal securities laws.

Plaintiffs' transactions in the security that is the subject of this action during the Trading Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost |
|---|---|---|---|
| QCOR | See Attached Schedule A | | |

Sales:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost |
|---|---|---|---|
| QCOR | See Attached Schedule A | | |

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ____ day of March 2013 in Los Angeles, California.

David Taban, as Trustee of
The David Taban and Violet Taban
Living Trust

SCHEDULE A

| DATE | TRANSACTION ID | DESCRIPTION | QUANTITY |
|---|---|---|---|
| 8/3/2012 | 894156567 | Sold 13 QCOR Sep 22 2012 30.0 Put @ 1.5 | 13 |
| 8/3/2012 | 894152233 | Sold 137 QCOR Sep 22 2012 30.0 Put @ 1.45 | 137 |
| 8/7/2012 | 849710982 | Sold 200 QCOR Aug 18 2012 33.0 Put @ 0.2 | 200 |
| 8/13/2012 | 896302197 | Sold 30 QCOR Aug 18 2012 35.0 Put @ 0.2 | 30 |
| 8/13/2012 | 896286962 | Sold 50 QCOR Aug 18 2012 35.0 Put @ 0.2 | 50 |
| 8/13/2012 | 896302297 | Sold 32 QCOR Aug 18 2012 35.0 Put @ 0.2 | 32 |
| 8/14/2012 | 896617304 | Sold 50 QCOR Aug 18 2012 36.0 Put @ 0.15 | 50 |
| 8/14/2012 | 896623846 | Sold 50 QCOR Aug 18 2012 36.0 Put @ 0.15 | 50 |
| 8/14/2012 | 896624848 | Sold 50 QCOR Aug 18 2012 36.0 Put @ 0.15 | 50 |
| 8/14/2012 | 896624973 | Sold 50 QCOR Aug 18 2012 36.0 Put @ 0.15 | 50 |
| 8/14/2012 | 897053817 | Sold 100 QCOR Aug 18 2012 36.0 Put @ 0.15 | 100 |
| 8/15/2012 | 897056685 | Sold 50 QCOR Sep 22 2012 45.0 Put @ 6.3 | 50 |
| 8/15/2012 | 897058438 | Sold 200 QCOR Sep 22 2012 34.0 Put @ 0.95 | 200 |
| 8/16/2012 | 897545311 | Sold 15 QCOR Oct 20 2012 32.0 Put @ 1.5 | 15 |
| 8/16/2012 | 897507716 | Sold 50 QCOR Jan 19 2013 32.0 Put @ 3.2 | 50 |
| 8/16/2012 | 897531798 | Sold 245 QCOR Oct 20 2012 32.0 Put @ 1.35 | 245 |
| 8/16/2012 | 897532271 | Sold 50 QCOR Jan 19 2013 32.0 Put @ 3.1 | 50 |
| 8/16/2012 | 897532473 | Sold 200 QCOR Sep 22 2012 32.0 Put @ 0.55 | 200 |
| 8/16/2012 | 897537771 | Sold 126 QCOR Sep 22 2012 33.0 Put @ 0.7 | 126 |
| 8/17/2012 | 897917652 | Sold 200 QCOR Sep 22 2012 34.0 Put @ 0.75 | 200 |
| 8/20/2012 | 898250933 | REMOVAL OF OPTION DUE TO EXPIRATION (QCOR Aug 18 2012 30.0 Put) | 200 |
| 8/20/2012 | 898250944 | REMOVAL OF OPTION DUE TO EXPIRATION (QCOR Aug 18 2012 33.0 Put) | 300 |
| 8/20/2012 | 898250960 | REMOVAL OF OPTION DUE TO EXPIRATION (QCOR Aug 18 2012 35.0 Put) | 112 |
| 8/20/2012 | 898250971 | REMOVAL OF OPTION DUE TO EXPIRATION (QCOR Aug 18 2012 36.0 Put) | 250 |
| 8/21/2012 | 898686458 | Sold 260 QCOR Sep 22 2012 37.0 Put @ 1.05 | 260 |
| 8/21/2012 | 898686520 | Sold 260 QCOR Sep 22 2012 37.0 Put @ 1.05 | 260 |
| 8/23/2012 | 899337899 | Sold 260 QCOR Sep 22 2012 36.0 Put @ 0.5 | 260 |
| 8/24/2012 | 899801404 | Sold 180 QCOR Jan 19 2013 38.0 Put @ 3.9 | 180 |
| 8/24/2012 | 899807765 | Sold 155 QCOR Oct 20 2012 37.0 Put @ 1.5 | 155 |
| 8/24/2012 | 899804253 | Sold 180 QCOR Sep 22 2012 38.0 Put @ 0.7 | 180 |
| 8/24/2012 | 899803977 | Sold 25 QCOR Oct 20 2012 37.0 Put @ 1.45 | 25 |
| 8/27/2012 | 900086925 | Sold 26 QCOR Sep 22 2012 45.0 Put @ 3.3 | 26 |
| 9/4/2012 | 902915082 | Sold 200 QCOR Oct 20 2012 42.0 Put @ 1.3 | 200 |

| Date | Order # | Description | Quantity |
|---|---|---|---|
| 9/4/2012 | 9029290829 | Bought 20 QCOR Sep 22 2012 34.0 Put @ 0.1 | 20 |
| 9/4/2012 | 9022902887 | Bought 26 QCOR Sep 22 2012 33.0 Put @ 0.1 | 26 |
| 9/4/2012 | 9029291027 | Bought 101 QCOR Sep 22 2012 30.0 Put @ 0.05 | 101 |
| 9/5/2012 | 9035449407 | Bought 49 QCOR Sep 22 2012 30.0 Put @ 0.1 | 49 |
| 9/5/2012 | 9035466550 | Sold 260 QCOR Oct 20 2012 45.0 Put @ 1.65 | 260 |
| 9/5/2012 | 9035468278 | Bought 200 QCOR Sep 22 2012 32.0 Put @ 0.1 | 200 |
| 9/5/2012 | 9035469034 | Bought 100 QCOR Sep 22 2012 33.0 Put @ 0.1 | 100 |
| 9/5/2012 | 9035475594 | Sold 180 QCOR Sep 22 2012 46.0 Put @ 0.75 | 180 |
| 9/5/2012 | 9035621326 | Bought 15 QCOR Oct 20 2012 32.0 Put @ 0.2 | 15 |
| 9/5/2012 | 9035497449 | Bought 200 QCOR Sep 22 2012 34.0 Put @ 0.15 | 200 |
| 9/5/2012 | 9035621635 | Bought 33 QCOR Sep 22 2012 34.0 Put @ 0.13 | 33 |
| 9/5/2012 | 9035621638 | Sold 11 QCOR Jan 19 2013 42.0 Put @ 3.35 | 11 |
| 9/5/2012 | 9035621644 | Sold 22 QCOR Jan 19 2013 42.0 Put @ 3.33 | 22 |
| 9/5/2012 | 9035621629 | Bought 27 QCOR Jan 19 2013 32.0 Put @ 1.08 | 27 |
| 9/5/2012 | 9035621633 | Sold 27 QCOR Jan 19 2013 40.0 Put @ 2.73 | 27 |
| 9/5/2012 | 9035524974 | Sold 11 QCOR Jan 19 2013 42.0 Put @ 3.27 | 11 |
| 9/5/2012 | 9035524976 | Sold 136 QCOR Jan 19 2013 42.0 Put @ 3.25 | 136 |
| 9/5/2012 | 9035524982 | Bought 147 QCOR Sep 22 2012 34.0 Put @ 0.1 | 147 |
| 9/5/2012 | 9035536143 | Sold 73 QCOR Jan 19 2013 40.0 Put @ 2.63 | 73 |
| 9/5/2012 | 9035536166 | Bought 73 QCOR Jan 19 2013 32.0 Put @ 1.13 | 73 |
| 9/7/2012 | 9043591460 | Sold 50 QCOR Oct 20 2012 48.0 Put @ 2.05 | 50 |
| 9/7/2012 | 9043591466 | Bought 50 QCOR Sep 22 2012 40.0 Put @ 0.15 | 50 |
| 9/7/2012 | 9043641915 | Sold 100 QCOR Sep 22 2012 49.0 Put @ 0.8 | 100 |
| 9/7/2012 | 9043656269 | Sold 260 QCOR Oct 20 2012 46.0 Put @ 1.43 | 260 |
| 9/7/2012 | 9043656280 | Bought 260 QCOR Sep 22 2012 36.0 Put @ 0.13 | 260 |
| 9/7/2012 | 9043656143 | Sold 180 QCOR Oct 20 2012 48.0 Put @ 2.03 | 180 |
| 9/7/2012 | 9043656230 | Bought 180 QCOR Sep 22 2012 38.0 Put @ 0.18 | 180 |
| 9/7/2012 | 9043696323 | Bought 200 QCOR Sep 22 2012 37.0 Put @ 0.15 | 200 |
| 9/7/2012 | 9043706330 | Sold 245 QCOR Oct 20 2012 46.0 Put @ 1.43 | 245 |
| 9/7/2012 | 9043706350 | Bought 245 QCOR Oct 20 2012 32.0 Put @ 0.18 | 245 |
| 9/11/2012 | 9055238721 | Sold 100 QCOR Jan 19 2013 42.0 Put @ 2.9 | 100 |
| 9/14/2012 | 9069489541 | Sold 140 QCOR Sep 22 2012 48.0 Put @ 0.63 | 140 |
| 9/14/2012 | 9069489564 | Sold 40 QCOR Sep 22 2012 48.0 Put @ 0.61 | 40 |
| 9/14/2012 | 9069489581 | Bought 140 QCOR Sep 22 2012 37.0 Put @ 0.08 | 140 |

| Date | Number | Description | Qty |
|---|---|---|---|
| 9/14/2012 | 9069489593 | Bought 40 QCOR Sep 22 2012 37.0 Put @ 0.06 | 40 |
| 9/19/2012 | 9083855168 | Bought 100 QCOR Sep 22 2012 49.0 Put @ 19.4 | 100 |
| 9/19/2012 | 9083856335 | Bought 180 QCOR Sep 22 2012 48.0 Put @ 18.2 | 180 |
| 9/19/2012 | 9083865421 | Bought 180 QCOR Sep 22 2012 46.0 Put @ 17 | 180 |
| 9/19/2012 | 9083868205 | Bought 76 QCOR Sep 22 2012 45.0 Put @ 15.8 | 76 |
| 9/19/2012 | 9083871104 | Bought 140 QCOR Sep 22 2012 37.0 Put @ 8.3 | 140 |
| 9/19/2012 | 9084269496 | Bought 50 QCOR Oct 20 2012 48.0 Put @ 22.3 | 50 |
| 9/19/2012 | 9084272246 | Bought 50 QCOR Oct 20 2012 46.0 Put @ 20.4 | 50 |
| 9/19/2012 | 9084296544 | Bought 455 QCOR Oct 20 2012 46.0 Put @ 21.1 | 455 |
| 9/24/2012 | 9095938573 | Bought 180 QCOR Oct 20 2012 48.0 Put @ 28.3 | 180 |
| 9/24/2012 | 9095948409 | Bought 260 QCOR Oct 20 2012 45.0 Put @ 25 | 260 |
| 9/24/2012 | 9095952036 | Bought 200 QCOR Oct 20 2012 42.0 Put @ 22.3 | 200 |
| 9/24/2012 | 9095962074 | Bought 180 QCOR Oct 20 2012 37.0 Put @ 17.5 | 180 |
| 9/24/2012 | 9095970931 | Bought 280 QCOR Jan 19 2013 42.0 Put @ 23.4 | 280 |
| 9/24/2012 | 9095976676 | Bought 100 QCOR Jan 19 2013 40.0 Put @ 21.1 | 100 |
| 9/24/2012 | 9095981413 | Bought 180 QCOR Jan 19 2013 38.0 Put @ 19 | 180 |

*END OF FILE***

| SYMBOL | PRICE | COMMISSION | AMOUNT | NET CASH BALANCE | REG FEE |
|--------|-------|------------|--------|------------------|---------|
| QCOR Sep 22 2012 30.0 Put | $1.50 | $9.75 | $1,939.97 | --- | 0.05 |
| QCOR Sep 22 2012 30.0 Put | $1.45 | $102.75 | $19,759.47 | --- | 0.45 |
| QCOR Aug 18 2012 33.0 Put | $0.20 | $150.00 | $3,846.51 | --- | 0.09 |
| QCOR Aug 18 2012 35.0 Put | $0.20 | $22.50 | $576.97 | --- | 0.02 |
| QCOR Aug 18 2012 35.0 Put | $0.20 | $37.50 | $961.62 | --- | 0.03 |
| QCOR Aug 18 2012 35.0 Put | $0.20 | $24.00 | $615.43 | --- | 0.02 |
| QCOR Aug 18 2012 36.0 Put | $0.15 | $37.50 | $711.63 | --- | 0.02 |
| QCOR Aug 18 2012 36.0 Put | $0.15 | $37.50 | $711.63 | --- | 0.02 |
| QCOR Aug 18 2012 36.0 Put | $0.15 | $47.49 | $701.64 | --- | 0.02 |
| QCOR Aug 18 2012 36.0 Put | $0.15 | $84.99 | $1,413.27 | --- | 0.04 |
| QCOR Aug 18 2012 36.0 Put | $0.15 | $47.49 | $15,351.31 | --- | 0.35 |
| QCOR Sep 22 2012 40.0 Put | $3.08 | $47.49 | $31,450.95 | --- | 0.71 |
| QCOR Sep 22 2012 45.0 Put | $6.30 | $159.99 | $18,836.18 | --- | 0.43 |
| QCOR Sep 22 2012 34.0 Put | $0.95 | $21.24 | $2,228.44 | --- | 0.06 |
| QCOR Oct 20 2012 32.0 Put | $1.50 | $47.49 | $15,951.30 | --- | 0.36 |
| QCOR Jan 19 2013 32.0 Put | $3.20 | $193.74 | $32,876.34 | --- | 0.75 |
| QCOR Oct 20 2012 32.0 Put | $1.35 | $47.49 | $15,451.31 | --- | 0.35 |
| QCOR Jan 19 2013 32.0 Put | $3.10 | $159.99 | $10,836.36 | --- | 0.25 |
| QCOR Sep 22 2012 32.0 Put | $0.55 | $104.49 | $8,713.16 | --- | 0.2 |
| QCOR Sep 22 2012 33.0 Put | $0.70 | $159.99 | $14,836.27 | --- | 0.34 |
| QCOR Sep 22 2012 34.0 Put | $0.75 | | $0.00 | --- | |
| QCOR Aug 18 2012 30.0 Put | | | $0.00 | --- | |
| QCOR Aug 18 2012 33.0 Put | | | $0.00 | --- | |
| QCOR Aug 18 2012 35.0 Put | | | $0.00 | --- | |
| QCOR Aug 18 2012 36.0 Put | $1.05 | $204.99 | $27,089.97 | --- | 0.62 |
| QCOR Sep 22 2012 37.0 Put | $1.05 | $204.99 | $27,089.97 | --- | 0.62 |
| QCOR Sep 22 2012 37.0 Put | $0.50 | $204.99 | $12,790.29 | --- | 0.3 |
| QCOR Sep 22 2012 36.0 Put | $3.90 | $144.99 | $70,050.37 | --- | 1.58 |
| QCOR Jan 19 2013 38.0 Put | $1.50 | $126.24 | $23,120.59 | --- | 0.53 |
| QCOR Oct 20 2012 37.0 Put | $0.70 | $144.99 | $12,451.66 | --- | 0.29 |
| QCOR Sep 22 2012 38.0 Put | $1.45 | $28.74 | $3,595.74 | --- | 0.09 |
| QCOR Oct 20 2012 37.0 Put | $3.30 | $29.49 | $8,549.86 | --- | 0.2 |
| QCOR Sep 22 2012 45.0 Put | $1.30 | $159.99 | $25,836.02 | --- | 0.59 |
| QCOR Oct 20 2012 42.0 Put | | | | | |

| Option | Price | Amount | P/L | Delta |
|---|---|---|---|---|
| QCOR Sep 22 2012 34.0 Put | $0.10 | $24.99 | ($225.33) | --- |
| QCOR Sep 22 2012 33.0 Put | $0.10 | $29.49 | ($289.94) | --- |
| QCOR Sep 22 2012 30.0 Put | $0.05 | $- | ($506.72) | --- |
| QCOR Sep 22 2012 30.0 Put | $0.10 | $46.74 | ($537.58) | --- |
| QCOR Oct 20 2012 45.0 Put | $1.65 | $204.99 | $42,689.62 | 0.97 |
| QCOR Sep 22 2012 32.0 Put | $0.10 | $159.99 | ($2,163.39) | --- |
| QCOR Sep 22 2012 33.0 Put | $0.10 | $84.99 | ($1,086.69) | --- |
| QCOR Sep 22 2012 46.0 Put | $0.75 | $144.99 | $13,351.64 | 0.31 |
| QCOR Oct 20 2012 32.0 Put | $0.20 | $21.24 | ($321.50) | --- |
| QCOR Sep 22 2012 34.0 Put | $0.15 | $159.99 | ($3,163.39) | --- |
| QCOR Sep 22 2012 34.0 Put | $0.13 | $34.74 | ($464.31) | --- |
| QCOR Jan 19 2013 42.0 Put | $3.35 | $24.75 | $3,659.97 | 0.17 |
| QCOR Jan 19 2013 42.0 Put | $3.33 | $- | $7,325.45 | 0.09 |
| QCOR Jan 19 2013 32.0 Put | $1.08 | $30.24 | ($2,946.70) | --- |
| QCOR Jan 19 2013 40.0 Put | $2.73 | $20.25 | $7,350.12 | 0.17 |
| QCOR Jan 19 2013 42.0 Put | $3.27 | $110.25 | $3,486.47 | 0.09 |
| QCOR Jan 19 2013 42.0 Put | $3.25 | $- | $44,196.68 | 1 |
| QCOR Sep 22 2012 34.0 Put | $0.10 | $120.24 | ($1,592.74) | --- |
| QCOR Jan 19 2013 40.0 Put | $2.63 | $54.75 | $19,142.56 | 0.44 |
| QCOR Oct 20 2012 46.0 Put | $1.43 | $64.74 | ($8,314.99) | --- |
| QCOR Sep 22 2012 36.0 Put | $2.05 | $195.00 | $10,211.42 | 0.84 |
| QCOR Oct 20 2012 48.0 Put | $2.05 | $204.99 | ($798.34) | --- |
| QCOR Sep 22 2012 40.0 Put | $0.15 | $47.49 | $7,913.13 | 0.23 |
| QCOR Sep 22 2012 49.0 Put | $2.03 | $135.00 | $36,979.74 | 0.18 |
| QCOR Sep 22 2012 38.0 Put | $0.18 | $144.99 | ($3,589.41) | --- |
| QCOR Sep 22 2012 48.0 Put | $2.03 | $135.00 | $36,401.12 | 0.82 |
| QCOR Oct 20 2012 37.0 Put | $0.13 | $183.75 | ($3,388.05) | --- |
| QCOR Oct 20 2012 46.0 Put | $1.43 | $159.99 | ($3,163.39) | --- |
| QCOR Oct 20 2012 32.0 Put | $0.15 | $193.75 | $34,846.29 | 0.79 |
| QCOR Jan 19 2013 32.0 Put | $1.13 | $- | ($4,607.91) | --- |
| QCOR Sep 22 2012 42.0 Put | $2.90 | $84.99 | $28,912.66 | 0.65 |
| QCOR Sep 22 2012 48.0 Put | $0.63 | $135.00 | $8,682.42 | 0.2 |
| QCOR Sep 22 2012 48.0 Put | $0.61 | $- | $2,439.26 | 0.06 |
| QCOR Jan 19 2013 42.0 Put | $0.08 | $144.99 | ($1,267.37) | --- |
| QCOR Sep 22 2012 37.0 Put | $0.08 | $144.99 | ($1,267.37) | --- |

| Description | Price | Value | Cost | |
|---|---|---|---|---|
| QCOR Sep 22 2012 37.0 Put | $0.06 | | $- | |
| QCOR Sep 22 2012 49.0 Put | $19.40 | $119.99 | ($240.68) | --- |
| QCOR Sep 22 2012 48.0 Put | $18.20 | $179.99 | ($194,146.69) | --- |
| QCOR Sep 22 2012 48.0 Put | $17.00 | $179.99 | ($327,783.05) | --- |
| QCOR Sep 22 2012 46.0 Put | $15.80 | $101.99 | ($306,183.05) | --- |
| QCOR Sep 22 2012 46.0 Put | $8.30 | $149.99 | ($120,183.29) | --- |
| QCOR Sep 22 2012 45.0 Put | $22.30 | $149.99 | ($116,352.37) | --- |
| QCOR Sep 22 2012 45.0 Put | $21.10 | $47.49 | ($111,548.34) | --- |
| QCOR Sep 22 2012 37.0 Put | $20.40 | $47.49 | ($102,048.34) | --- |
| QCOR Oct 20 2012 48.0 Put | $47.49 | $351.24 | ($960,408.98) | --- |
| QCOR Oct 20 2012 46.0 Put | $28.30 | $179.99 | ($509,608.05) | --- |
| QCOR Oct 20 2012 46.0 Put | $25.00 | $239.99 | ($650,244.41) | --- |
| QCOR Oct 20 2012 46.0 Put | $22.30 | $194.99 | ($446,198.39) | --- |
| QCOR Oct 20 2012 48.0 Put | $17.50 | $179.99 | ($315,183.05) | --- |
| QCOR Oct 20 2012 48.0 Put | $23.40 | $254.99 | ($655,459.75) | --- |
| QCOR Oct 20 2012 45.0 Put | $21.10 | $179.99 | ($211,121.69) | --- |
| QCOR Oct 20 2012 42.0 Put | $19.00 | $179.99 | ($342,183.05) | --- |
| QCOR Oct 20 2012 42.0 Put | | | | |
| QCOR Oct 20 2012 37.0 Put | | | | |
| QCOR Jan 19 2013 42.0 Put | | | | |
| QCOR Jan 19 2013 40.0 Put | | | | |
| QCOR Jan 19 2013 38.0 Put | | | | |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge David O. Carter and the assigned discovery Magistrate Judge is Jean P. Rosenbluth.

The case number on all documents filed with the Court should read as follows:

## SACV13- 425 DOC (JPRx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [✓] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd., Suite 510
Los Angeles, CA 90048

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| DAVID TABAN and VIOLET TABAN, as Trustees of THE DAVID TABAN AND VIOLET TABAN LIVING TRUST<br><br>PLAINTIFF(S) | CASE NUMBER<br><br>SA CV13-0425 DOC (JPPx) |
|---|---|
| v.<br><br>QUESTCOR PHARMACEUTICALS, INC., a California corporation; DON M. BAILEY, an individual; MICHAEL H. MULROY, an individual; STEPHEN L. CARTT, an individual; DAVID YOUNG, an individual; and DOES 1-10    DEFENDANT(S). | **SUMMONS** |

TO:     DEFENDANT(S):

        A lawsuit has been filed against you.

        Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, Henry D. Gradstein _____, whose address is Gradstein & Marzano, P.C., 6310 San Vicente Blvd., Suite 510, Los Angeles, CA 90048 __.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _____
        MAR  1 2  2013

By: _____
        Deputy Clerk

        (Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*


**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

DAVID TABAN and VIOLET TABAN, as Trustees of THE DAVID TABAN AND VIOLET TABAN LIVING TRUST

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

QUESTCOR PHARMACEUTICALS, INC., a California corporation; DON M. BAILEY, an individual; MICHAEL H. MULROY, an individual; STEPHEN L. CARTT, an individual; DAVID YOUNG, an individual; and DOES 1 THROUGH 50, inclusive

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Henry D. Gradstein, Esq. (SBN 89747)   Maryann R. Marzano, Esq. (SBN 96867)
GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd., Suite 510
Los Angeles, CA 90048   Telephone: (323) 302-9488

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT:** $ 5 million

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. §§ 78j(b) and 78t(a))   COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS, FRAUD-INTENTIONAL MISREPRESENTATION AND FRAUDULENT CONCEALMENT

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☒ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**   Case Number:   SACV13-0425

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

CV-71 (02/13)   CIVIL COVER SHEET   Page 1 of 2

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES**: Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ NO   ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES**: Have any cases been previously filed in this court that are related to the present case?  ☐ NO   ☒ YES

If yes, list case number(s):  8:12-cv-01623-DMG (FMOx)

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)  ☒ A. Arise from the same or closely related transactions, happenings, or events; or

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☒ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE**: (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

**\*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _____  DATE: March 12, 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

**Key to Statistical codes relating to Social Security Cases:**

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |