1  HENRY D. GRADSTEIN, ESQ. (SBN 89747)
   *hgradstein@gradstein.com*
2  MARYANN R. MARZANO, ESQ. (SBN 96867)
   *mmarzano@gradstein.com*
3  GRADSTEIN & MARZANO, P.C.
   6310 San Vicente Blvd., Suite 510
4  Los Angeles, CA 90048
   Telephone: (323) 302-9488
5
   Attorneys for Plaintiffs
6  David Taban and Violet Taban,
   as Trustees of The David and Violet Taban
7  Living Trust (previously identified as David Taban
   and Violet Taban, as Trustees of The David
8  Taban and Violet Taban Living Trust)

9

10              **UNITED STATES DISTRICT COURT**

11             **CENTRAL DISTRICT OF CALIFORNIA**

12                    **WESTERN DIVISION**

13

14  DAVID TABAN and VIOLET          Case No.: SACV13-0425-DMG (JPRX)
    TABAN, as Trustees of THE DAVID
15  TABAN AND VIOLET TABAN          **FIRST AMENDED COMPLAINT FOR:**
    LIVING TRUST,
16                                  **1. VIOLATION OF THE FEDERAL**
17          Plaintiffs,                **SECURITIES LAWS;**
                                    **2. FRAUD-INTENTIONAL**
18       vs.                           **MISREPRESENTATION; AND**
                                    **3. FRAUDULENT CONCEALMENT**
19
    QUESTCOR PHARMACEUTICALS,
20  INC., a California corporation; DON
    M. BAILEY, an individual;
21  MICHAEL H. MULROY, an
    individual; STEPHEN L. CARTT, an   **DEMAND FOR JURY TRIAL**
22  individual; DAVID YOUNG, an
    individual, and DOES 1 THROUGH
23  10, inclusive,
24
            Defendants.
25

26

27

28

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1     Plaintiffs DAVID TABAN and VIOLET TABAN, as Trustees of THE

2 DAVID AND VIOLET TABAN LIVING TRUST (previously identified as David

3 Taban and Violet Taban, as Trustees of The David Taban and Violet Taban Living

4 Trust) (collectively, "Plaintiffs"), complain and allege against Defendants

5 QUESTCOR PHARMACEUTICALS, INC. ("Questcor" or the "Company"), DON

6 M. BAILEY ("Bailey"), MICHAEL H. MULROY ("Mulroy"), STEPHEN L.

7 CARTT ("Cartt") and DAVID YOUNG ("Young") (collectively, "Defendants"), as

8 follows:

9                          **INTRODUCTION**

10     1.     This is an action for violation of the federal securities laws and fraud

11 with respect to Plaintiffs' trading and sale of put options for Questcor common

12 stock between approximately April 26, 2011 and September 24, 2012, inclusive

13 (the "Trading Period"), against Questcor and certain of its officers and/or directors

14 for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and

15 Rule 10b-5 promulgated thereunder.  These claims are asserted against Questcor

16 and certain of its officers and/or directors who throughout the Trading Period, made

17 materially false and misleading statements about the effectiveness of, and prospects

18 for, Questcor's primary product H.P. Acthar Gel (Repository Corticotropin

19 Injection) ("Acthar") while simultaneously using Questcor's cash to prop up the

20 price of Questcor shares via the purchase of hundreds of millions of dollars of

21 Questcor stock into the open market.  As a result of Defendants' misconduct,

22 Questcor's stock traded at artificially inflated prices, reaching a Trading Period high

23 of more than $57 per share.  Questcor's officers and directors took advantage of

24 Defendants' fraud by selling more than $40 million of their own Questcor shares at

25 artificially inflated prices.  As the truth about Acthar's effectiveness and prospects

26 reached the market, the price of Questcor stock collapsed to $18 per share, 68%

27 below its Trading Period high, inflicting as much as $1 billion of harm on

28 Questcor's public shareholders and other traders.

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

## SUMMARY OF THE ACTION

2.     Questcor is a biopharmaceutical company with essentially one product - Acthar, an injectable drug that is currently approved by the U.S. Food and Drug Administration ("FDA") for the treatment of a number of indications, including multiple scelorosis ("MS"), a condition of the central nervous system; nephrotic syndrome ("NS"), a kidney condition; and infantile spasms ("IS"), an epileptic condition affecting young children.  Sales of Acthar account for more than 99% of Questcor's annual revenue.

3.     Acthar has been available as a treatment for more than 60 years. And, although Acthar is responsible for generating almost all of Questcor's revenue and income, Questcor did not invent, discover or meaningfully enhance the use or efficacy of Acthar.  Instead, Questcor purchased the drug in 2001, dramatically increased its price, and adopted sales and marketing tactics designed to expand the use of Acthar for indications for which Defendants lacked a meaningful scientific or medical basis.  In other words, Questcor effectively became a company of salespeople, rather than the "biopharmaceutical" company it claimed to be.  In the words of Questcor CEO Don M. Bailey, "this is a good place to be for sales people. We are a sales company, we are commercially focused, and there's [sic] not that many companies that have that orientation."

4.     To support Questcor's singular focus on increasing Acthar sales, Defendants sought to create a perception that a legitimate scientific basis existed for Acthar as a treatment for indications other than IS - the indication for which Acthar had been used for decades.  To that end, Questcor began funding - and publicizing – a number of Acthar "studies."  But unlike modern best practices, the "studies" Questcor paid for and utilized were not conducted in accordance with accepted scientific norms, but rather were designed to obtain a desired outcome.  For instance, the most significant "study" publicized by Questcor during the Trading Period (and utilized by Questcor to market Acthar to other physicians and support

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

1  requests for reimbursement from insurers) was conducted in 2010 by Dr. Andrew

2  Bomback ("Bomback").  However, the 2010 Bomback study on the effectiveness of

3  Acthar for treating NS was a "retrospective" study which included a review of a

4  sample of just 21 patients, 40% of whom were patients of Dr. Bomback's own

5  practice.  Questcor paid $50,000 to Dr. Bomback for "consulting" with Questcor

6  and completing this "study."  Moreover, before the results were made public, Dr.

7  Bomback essentially sold the results to a money manager in Massachusetts, who in

8  turn traded on that undisclosed information.  That money manager is currently

9  being sued by the State of Massachusetts for insider trading and Dr. Bomback's

10  complicity is set forth in that complaint.

11       5.     Defendants' focus on generating Acthar sales growth was without

12  regard to patient need or efficacy.  In fact, Questcor has never conducted a

13  legitimate multiple-phase randomized, double blind test to evaluate Acthar's

14  efficacy for MS, NS, or any other indication.  Rather, Questcor routinely funded

15  small "investigator-led studies" that were designed solely to support Questcor's

16  sales staff and insurance coverage group.  And, when such studies were not

17  providing the results Questcor wanted, Questcor simply stopped funding these

18  "studies," so as to prevent potentially negative results from jeopardizing Acthar's

19  marketing prospects.

20       6.     Questcor's efforts to drive sales growth also included making payments

21  to MS patients in exchange for their willingness to attend and participate in Acthar

22  marketing events held for potential patients.  Specifically, during the Trading

23  Period, Questcor hired as "contractors" patients who had been treated with Acthar

24  for MS flare-ups.  Those contractors were paid to attend gatherings of MS patients

25  to discuss and promote Acthar.  As part of their contract, Questcor provided

26  "training" to these individuals, and scheduled and organized the meetings for these

27  patient/contractors to attend.

28

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

- 4 -

7.     By making payments to doctors who prescribed Acthar and to patients who had been prescribed the drug, Questcor was able to report ever-increasing results, driving its stock price upward.  To maintain strong revenue growth, Questcor vastly expanded its sales force.  As of January 11, 2011, Questcor employed 152 full-time employees, of which 75% were "engaged in sales and commercialization activities."  A year later, that number had mushroomed to 206 full-time employees, 148 of whom were "engaged in sales and commercialization activities."  Dozens more sales people were added in 2012.

8.     Having dramatically raised the price of Acthar to more than $23,000 per vial, it did not take a significant increase in the number of prescriptions to dramatically alter the Company's financial results.  In fact, and relying on the Bomback "study," Defendants suggested to investors during the Trading Period, that the market for Acthar as a treatment of NS alone could be as much as *$1 billion*.

9.     As part of their scheme to inflate the trading price of Questcor stock, Defendants also caused the Company to use its cash reserves to buy Questcor stock in the open market.  Defendants caused Questcor to buy back shares while at the very same time, Defendants were dumping their own shares.  For instance, from late April through May 15, 2012, Defendants caused Questcor to buy more than three million shares in the open market - at the very same time, Defendants were selling more than 1 million of their own shares at prices as high as $43.95 per share.  In fact, having successfully driven Questcor's stock price up, Questcor insiders seized the opportunity to capitalize on their fraud by dumping unprecedented amounts of  Questcor stock -  more than $40 million - at artificially inflated levels:

| Defendant | Shares Sold | Proceeds |
|---|---|---|
| Donald M. Bailey | 440,000 | $17,718,590 |
| Stephen L. Cartt | 505,509 | $16,215,281 |
| David Young | 175,124 | $7,047,324 |
| Totals: | 1,120,633 | $40,981,195 |

- 5 -

FIRST AMENDED COMPLAINT

10.     On September 19, 2012, Citron Research ("Citron") reported that Aetna Inc. ("Aetna"), one of the nation's largest insurers, had engaged in its own medical review of the indications for which the FDA had approved Acthar, and based upon its findings, *Aetna determined that clinical research supported only one of the indications - IS*. In Aetna's clinical policy bulletin issued in connection with its review, Aetna reported that studies suggested that the drug is only "medically necessary" for IS, and not for other indications, such as MS, or NS that are treated with steroids. According to an Aetna spokesperson, *Acthar treatment "'is not medically necessary because there is no clinical evidence that the drug is more effective than steroids.'"* On this news, Questcor's stock plummeted $24 per share to close at $26 per share on September 19, 2012, a one-day decline of 48% on massive volume of almost 64 million shares.

11.     Five days later, on September 24, 2012, Questcor announced in a Form 8-K filed with the Securities and Exchange Commission ("SEC") that the U.S. Attorney's Office had initiated an investigation into the Company's promotional practices. On this news, Questcor's stock dropped another $11 per share to close at $19.08 per share on September 24, 2012, a one-day decline of 37% on volume of more than 31 million shares.

12.     Having caused Questcor to make payments to doctors and patients to drive sales of Acthar, Defendants then utilized the purported efficacy and success of Acthar to sell over $40 million of their own Questcor shares at prices as high as $57.89 per share. Other investors who relied on Defendants' false statements were, however, not so lucky. For, as Defendants dumped millions of shares, the truth about Acthar, its efficacy and Questcor's prospects reached the market, and Questcor shares plunged 67% from their Trading Period high - causing substantial economic harm to Plaintiffs, when Plaintiffs were forced to cover puts sold at artificially inflated prices after Defendants' fraudulent conduct caused Questcor's stock to rise to artificial levels.

- 6 -

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question), Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1367 (supplemental jurisdiction).

15.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

16.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

17.    Plaintiffs David Taban and Violet Taban, Trustees of The David and Violet Taban Living Trust ( previously identified  as David Taban and Violet Taban, as Trustees of The David Taban and Violet Taban Living Trust) (collectively "Plaintiffs"), traded and sold put options for Questcor common stock during the Trading Period as set forth in the accompanying certification, incorporated by reference herein, and were damaged as a result of Defendants' wrongdoing as alleged in this Complaint.

18.    Defendant Questcor Pharmaceuticals, Inc. claims to be a biopharmaceutical company that relies entirely on the sale of its principle drug, Acthar, to generate revenue.  Questcor is a California corporation that maintains its principal executive offices at 1300 North Kellogg Drive, Suite D, Anaheim, California 92807.  Questcor's stock is traded under the symbol QCOR on the NASDAQ, which is an efficient market.

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

19.     Defendant Don M. Bailey ("Bailey") is, and at all relevant times was, the Company's Chief Executive Officer ("CEO"), President and a director.  During the Trading Period, defendant Bailey signed and/or caused to be filed with the SEC documents that contained false and misleading statements as set forth herein, including SEC Forms 10-Q and 10-K.  Defendant Bailey made various other false and misleading statements during the Trading Period in press releases and on conference calls, as set forth herein.  During the Trading Period, Defendant Bailey sold 440,000 shares of his Questcor stock at artificially inflated prices for proceeds of over $17.7 million, while in possession of material non-public information.

20.     Defendant Michael H. Mulroy ("Mulroy") is, and at all relevant times was, the Company's Chief Financial Officer ("CFO"), Senior Vice President and General Counsel and Corporate Secretary.  During the Trading Period, Defendant Mulroy also served as the Chief Compliance Officer ("CCO").  He signed and/or caused to be filed with the SEC documents that contained false and misleading statements as set forth herein, including SEC Forms 10-Q and 10-K.  Defendant Mulroy made various other false and misleading statements during the Trading Period in press releases and on conference calls, as set forth herein.

21.     Defendant Stephen L. Cartt ("Cartt") is the Company's Chief Operating Officer ("COO") and has been since February 2012.

a.     Defendant Cartt previously served as Questcor's Chief Business Officer and Executive Vice President.  During the Trading Period, defendant Cartt made various false and misleading statements in press releases and on conference calls, as set forth herein.  During the Trading Period, defendant Cartt sold 505,509 shares of his Questcor stock at artificially inflated prices for proceeds of over $16.2 million, while in possession of material non-public information.

b.     Prior to joining Questcor, Defendant Cartt was the Senior Director of Strategic Marketing for Elan Pharmaceuticals ("Elan"), where he led a team responsible for developing and "optimizing" Elan's Central Nervous System

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, Ca 90048

1  (CNS) product portfolio. Defendant Cartt joined Elan in March of 2000, shortly
2  before the Company launched a drug called Zonegran as a new treatment for
3  epilepsy. While the FDA approved Zonegran merely as an "adjunctive therapy" for
4  partial epileptic seizures suffered by adults, government authorities claim that Elan
5  intentionally designed a marketing program to target patients outside this narrow
6  group. Under Defendant Cartt's watch, Elan created at least three different off-label
7  promotion campaigns for Zonegran. While sales of Zonegran increased
8  dramatically initially, more than half of all prescriptions for the drug were for
9  conditions other than epilepsy. Defendant Cartt left Elan in the summer of 2002,
10 but his impact on the company persisted as the government began to investigate
11 Elan's marketing practices. With returns severely limited without the help of off-
12 label sales, Elan divested itself of Zonegran in 2004. Ultimately, in February 2011,
13 Elan pled guilty to criminal misconduct for illegally promoting Zonegran and paid
14 more than $200 million in criminal and civil penalties to resolve the government
15 action.

16     22.     Defendant David Young ("Young") is, and at all relevant times was,
17 the Company's Chief Scientific Officer. During the Trading Period, Defendant
18 Young made various false and misleading statements during the Trading Period in
19 press releases and on conference calls, as set forth herein. During the Trading
20 Period, Defendant Young sold 175,124 shares of his Questcor stock at artificially
21 inflated prices for proceeds of over $7 million, while in possession of material non-
22 public information.

23     23.     The Defendants named above in Paragraphs 19-22 are referred to
24 herein collectively as the "Individual Defendants." All of the Individual
25 Defendants except Mulroy are referred to herein collectively as the "Insider Trading
26 Defendants."

27     24.     The Individual Defendants, because of their positions with the
28 Company, possessed the power and authority to control the contents of Questcor's

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them, but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

25.    Further, the Insider Trading Defendants violated their duty to abstain from trading on inside information or to disclose inside information before trading Questcor stock.  While in possession of material non-public information, these Defendants sold 1,120,633 shares of Questcor stock for over $40 million in insider trading proceeds.

26.    On information and belief, Defendants Does 1 through 10 (collectively, the "Doe Defendants") are individuals and business entities who have participated or assisted in the conduct alleged herein or are otherwise responsible therefor.  The identity of these Doe Defendants presently is not and cannot be known to Plaintiffs, but Plaintiffs will seek leave of the Court to add them as named defendants when they are identified.

## **BACKGROUND**

27.    Questcor is essentially a single product company, with Acthar accounting for nearly all of the Company's revenue.[1]  Acthar is a highly specialized, low-volume, premium-priced drug.  It was originally approved by the

---

[1]    Questcor also has a product called "Doral" but sales of that product accounted for less than 1% of Questcor's reported net income during the Trading Period.

FDA in 1952.  The injectable hormone has a broad label, as it is currently approved by the FDA for use in 19 indications.  Acthar is a first-line treatment for IS, a rare seizure disorder that affects approximately 2,000 children annually in the U.S. Acthar was also approved for the treatment of MS relapse in 1978.  Although Acthar was used for such a treatment in the 1970s, it was largely abandoned in the 1980s after corticosteroids came on the market, as steroids are a superior and far less expensive alternative to Acthar.

28.     **Questcor acquired the rights to Acthar in 2001 for $100,000**.  At the time, Acthar was almost exclusively being used to treat IS.  In 2007, Questcor filed an application with the FDA to obtain orphan drug status for Acthar for the treatment of IS.  The FDA is authorized to grant orphan status to a drug that treats a disease affecting fewer than 200,000 people.  Orphan drug status provides a company with seven years of marketing exclusivity.  At the same time the Company filed its application with the FDA, **Questcor also raised the price of Acthar from $1,650 per vial to more than $23,000 per vial, an overnight price increase of over 1300%.**[2]  As a result of the significant price increase, 2007 was the first year in the history of the drug that Acthar was profitable.  The FDA approved Questcor's orphan drug status application in October 2010.

29.     Soon after the Company enacted the tremendous price hike, Questcor embarked on an aggressive strategy to transform Acthar into a blockbuster drug. Although Acthar received orphan drug status for the IS indication, Defendants' strategic goal was to dramatically expand its use for other indications, initially focusing at the end of 2007 on the use of Acthar for the treatment of MS, followed thereafter in the first quarter of 2011 on the use of Acthar for the treatment of NS. Questcor markets Acthar as a second line treatment for MS, that is when MS patients are not responsive to steroids, and markets Acthar as a first-line treatment

---

[2]     Questcor has continued to raise the price since 2007. At the beginning of the Trading Period it was sold for more than $23,000 per vial. This year Questcor sells it for $28,430 per vial.

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

1   for NS.

2        30.     As a result of Questcor's new strategy, the Company has been able to

3   report tremendous net sales increases -- from $49.8 million in 2007 to $509.3

4   million for 2012.  The main source of the Company's reported revenue growth is

5   the use of Acthar in the treatment of MS and NS.  IS, the condition for which it

6   received orphan drug status, now accounts for less than 10% of the Company's

7   revenues.

8   **DEFENDANTS' FRAUDULENT SCHEME**

9   **AND WRONGFUL COURSE OF BUSINESS**

10        31.     By increasing the price overnight from $1,650 to more than $23,000

11   per vial, and hiring dozens of sales people to promote and sell the product to

12   physicians (and patients), Questcor has posted dramatic increases in revenue and

13   profit.  But this was only one prong of Defendants' aggressive strategy to generate

14   revenue and profit.  The medical community (and the insurance companies which

15   pay for the treatment) requires a scientific or medical basis that justifies Acthar as a

16   viable treatment alternative to dramatically less expensive corticosteroid treatment.

17   So, as Questcor's second line of attack, Questcor began "sponsoring" studies by

18   treating physicians who were paid large sums to act as "consultants."  In turn, these

19   paid physicians prescribed Acthar to their patients and reported the results as

20   "studies."  Questcor, in turn, then used these study results as both part of its sales

21   materials to treating physicians in an attempt to provide a medical basis for

22   prescribing Acthar, as well as with insurance companies to obtain coverage for

23   payment.

24        32.     These so-called "studies" utilized by Defendants to ramp up Acthar

25   sales made a mockery of current best practices required by FDA regulations.

26   Because Acthar had been approved decades earlier for the indications for which

27   Questcor was currently marketing the drug, Questcor has never completed multiple-

28   phase, randomized double-blind clinical trials.  Instead, the so-called "studies"

- 12 -

FIRST AMENDED COMPLAINT

1   conducted at Defendants' behest were conducted by physicians with undisclosed

2   economic interests in supporting Defendants' product and driving Acthar sales.

3        33.    One of the "studies" Questcor relied on heavily to drive Acthar sales

4   during the Trading Period was a "study" conducted by Dr. Bomback.  The

5   Bomback study was designed to analyze Acthar's effectiveness as a treatment for

6   NS.  The retrospective "study" of 21 patients found that 9 of 11 patients with a

7   certain type of NS responded well to treatment.  Questcor then hailed the Bomback

8   "study" as the first modern test of Acthar for kidney patients and presented its

9   results to treating nephrologists and insurers in support of its Acthar marketing

10  efforts.  In truth, the "study" was a Questcor-funded retrospective analysis

11  conducted by a physician with an undisclosed economic stake, and conducted in a

12  manner inconsistent with accepted medical practice.

13       34.    Among the problems that plagued Dr. Bomback's study was the fact

14  that as a retrospective study it was inherently flawed and plagued with errors from

15  confounding and bias, particularly as to the selection of controls, which plague

16  "look back" studies as opposed to the accepted practice of using prospective double

17  blind trials.  Further, Dr. Bomback's "study" involved a review of the treatment

18  responses to Acthar of a sample of just 21 NS patients - 40% of whom were

19  patients of Bomback's own practice.  Finally, Dr. Bomback had received a $50,000-

20  a-year consulting contract with Questcor as the "study" was being conducted.[3]

21       35.    Equally disconcerting, Questcor adopted a practice whereby when it

22  became apparent that a Questcor-sponsored study would not yield the results

23  Questcor desired, Questcor would terminate the study prior to completion and

24  _____

25  [3]    Notably, before the results of Bomback's study were ever made public, Dr.
    Bomback effectively sold the results to a money manager from Massachusetts, who
26  in turn traded on the information.  That money manager is currently facing civil
    charges for insider trading brought by the securities division of the State of
27  Massachusetts.  Not only does Dr. Bomback's conduct constitute several of the
    allegations in the Massachusetts Complaint, but records show that he took
28  thousands of dollars from an intermediary that put him in touch with that money
    manager and others for the very purpose of allowing those managers to trade on
    inside information.

- 13 -

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

thereby prevent potentially negative results that could jeopardize Acthar's marketing prospects.  In one such instance, a nephrologist stopped a small study testing Acthar as a treatment for NS after determining that Acthar "'just didn't work,'" and Questcor was "'O.K. with me stopping because we weren't getting the results.'"  Another such study which sought to determine whether MS patients who did not have a good response to steroids should be treated with either another round of steroids or with Acthar was terminated by Questcor mid-study (and thereby precluded publication of the results) purportedly "to analyze data."

36.     Similarly, and in an effort to promote Acthar as an effective treatment for indications other than IS, Questcor employed a "speaker's bureau" of handsomely paid physician "consultants" to drive Acthar sales. These "hired guns" often would accompany Questcor sales representatives on visits to doctors' offices, and speak to other doctors about prescribing Acthar.

37.     Houston neurologist Dr. Staley A. Brod was among the "heavy prescribers" handsomely compensated by Questcor to promote Acthar.  Dr. Brod, whose bio is replete with Acthar studies in which he was or is involved, has been described as "'an evangelist for [Acthar]'" and "'the best salesperson that [Questcor] had.'"  And, Dr. Brod was paid well for his testimonials.  Questcor paid Dr. Brod $2,500 each time he told another doctor about Acthar.  As a result of his Questcor consulting endeavors, Dr. Brod was able to collect over $6,000 in a single day, and over $100,000 a year.  While Questcor claimed in a January 16, 2012 release that "[t]he Company does not provide financial incentives to doctors or other healthcare practitioners to prescribe Acthar," Dr. Brod was one of the two highest Acthar-prescribing physicians at the end of 2011.

38.     Questcor also utilized patient contractors and testimonials to support the sale of Acthar as an attractive treatment for MS.  Questcor's paid consultant doctors would recommend that certain patients serve as a contract speaker for the Company.  In one such instance, for example, Dr. Brod recommended to Questcor a

- 14 -

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

patient who experienced positive results from two Acthar treatments for MS flare-ups after not responding well and experiencing negative side effects from steroids. This patient became a contractor for Questcor, and she and others like her were paid by Questcor to attend gatherings of other MS patients - organized by the Company - and speak about their specific experience with Acthar and promote the drug. As part of the contract, Questcor provided training to these individuals, arranged the meetings, and reviewed the patient contractors' proposed presentations before they were presented.

39.     Defendants were highly cognizant that their own personal fortunes would fall dramatically if the truth about Defendants' scheme and wrongful course of business was revealed. Not only was their ability to amass a fortune through stock sales affected, but so too was their annual compensation. By dramatically increasing sales of Acthar without regard to its efficacy for a particular indication, Defendants received substantial stock option awards and "incentive compensation" in amounts far beyond their salaries, as detailed in the following chart:

| Name | Year | Salary | Options Award | Non-Equity Incentive Plan Compensation | Incentive and Options Awards[4] | Total |
|---|---|---|---|---|---|---|
| Don M. Bailey | 2011 | $584,875 | $2,628,815 | $1,332,540 | 677% | $4,546,230 |
| Michael H. Mulroy | 2011 | $342,147 | $938,863 | $468,881 | 411% | $1,749,891 |
| Stephen L. Cartt | 2011 | $389,917 | $1,126,635 | $781,756 | 489% | $2,298,308 |
| David Young | 2011 | $424,320 | $751,090 | $773,394 | 359% | $1,948,804 |

40.     Defendants kept close tabs on the success of their scheme to increase prescriptions by paying doctors and patients to promote and expand the use of

---

[4]     Calculated as Option Awards plus Incentive Plan Compensation, as a percentage of salary.

- 15 -

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

Acthar by other doctors and patients. Indeed, the very structure of the Company was designed for that purpose. The executive team and reporting structure was kept small in part to enable Defendants to maintain knowledge and close control over Questcor's ongoing payments to doctors and patients to increase Acthar sales. While during the Trade Period the number of Questcor full-time employees ranged from approximately 150 - 200 persons, more than 70% of all full-time employees were engaged in "sales and commercialization" activities.[5] Thus, the other areas of the Company - such as manufacturing, accounting, and compliance, and the administrative staff associated with those groups - were staffed with a small number of people. In fact, during the Trading Period, defendant Mulroy himself simultaneously served as the Company's General Counsel, CFO, Corporate Secretary, and CCO.

41. Regular monthly and quarterly meetings ensured Defendants were aware of exactly what was happening within the Company, including Acthar sales on a monthly basis, and any new "research" or "studies" that were being made public.

42. For instance, Questcor conducted bi-weekly senior leadership meetings. These meetings were attended by Bailey (CEO), Young (CSO), Cartt (COO), David J. Medeiros (VP of Manufacturing), and Mulroy (GC, CFO, CCO), as well as the head of sales. The topics discussed at these meetings varied, but included the tactical plan to assemble a sales force and the marketing plans for the Company.

43. Sales forecasts were also discussed at these meetings. Bailey led the forecasts discussion, and Cartt's personnel assembled the information. The Director of NS and a Director of MS reported to Cartt and assisted him in putting together what was foreseeable for the Company. The forecasts discussion also included a

---

[5] There were a number of "contractors" or other than full-time employees engaged in "sales and commercialization" as well. If those people were included the percentage would be higher.

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

1   market share discussion, as well a discussion of any influential papers recently

2   published that could have an effect on the forecasts. Young's group communicated

3   with Cartt's group about the impact of any new influential papers on sales. Since IS

4   (or West's syndrome) only had about 2,000 new cases per year, it was not necessary

5   to discuss or update more than once a month for that indication.

6        44.   At these meetings, Defendants also frequently discussed quarterly

7   results. With regard to quarterly results, these discussions were led by Bailey, Cartt

8   and the CFO in the senior leadership meetings.

9        45.   The nature of Questcor's Acthar sales was such that although the price

10   per vial was high, the number of prescriptions on even a weekly basis was so low

11   that Defendants did not believe it warranted more frequent reporting. Nevertheless,

12   Bailey had access to the actual sales numbers in real-time and thus, had the ability

13   to access or obtain this information throughout the month. Cartt accessed this

14   information as well. Because all Acthar sales went through a single specialty

15   pharmacy- Care Script - Defendants could obtain real-time sales information on

16   prescriptions by contacting Care Script.

17   **Insurance Payments**

18        46.   Acthar's high price of up to $250,000 for a single course of treatment

19   presented a fundamental challenge for Defendants to overcome – insurance

20   reimbursement. Reimbursement by insurance companies was critical to

21   Defendants' ability to maintain Questcor's rapid earnings growth.

22        47.   Typically, health insurers will cover treatments that are "medically

23   necessary." However, when clinical research does not support the efficacy of a

24   treatment over more accepted alternatives, a drug is not "medically necessary" and

25   health insurers may deny coverage. For example, UnitedHealthcare states:

26        Our Medical and Drug Policies express our determination of

27        whether a health service (e.g., test, drug, device or procedure) is

28        proven to be effective based on the published clinical evidence. They are also

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

1    used to decide whether a given health service is medically necessary.

2    *Services determined to be experimental, investigational, unproven, or not*

3    *medically necessary by the clinical evidence are typically not covered.*

4         48.    Despite Acthar's high price, health insurers seldom took exception to

5    the use of Acthar to treat IS due, in part, to the fact that Acthar had been used for

6    decades as a treatment for this rare disease, even if at much lower prices.  But

7    Defendants were aware that as Questcor began aggressively pushing Acthar for the

8    treatment of indications such as MS and NS for which there was no clinical data

9    supporting Acthar's efficacy, insurance companies would take notice.  And, they

10   did.

11        49.    To offset Defendants' concern about obtaining reimbursement for

12   Acthar for indications other than IS, during the Trading Period, Questcor employed

13   a staff of as many as 30 people whose sole responsibility was to assist patients with

14   obtaining insurance reimbursement.  This equated to approximately one staff

15   member for each of the roughly 30 prescriptions Questcor got in a typical day for

16   all uses and constituted as much as 15% of Questcor's entire workforce.  Thus,

17   when a prescription was placed by a doctor, Questcor's Acthar Support and

18   Assistance Program ("ASAP") directly assisted the patient with insurance

19   paperwork.

20        50.    Questcor tracked and frequently publicly reported its total "paid

21   prescriptions" for a given period and repeatedly described its improved financial

22   performance as being driven by these paid prescriptions.  Defendants freely

23   admitted during the Trading Period that insurance coverage was an important issue

24   to them, and they were "monitoring it closely."  According to defendant Cartt, "we

25   speak with payers [insurers] literally on a daily basis as we work the prescriptions

26   through our reimbursement hub."

27        51.    Analysts tracked this information as it was reported by Questcor, and

28   reported on it to investors.  For example, on an October 25, 2011 analyst call, Cartt

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1   was specifically asked about insurance coverage for Acthar.  He reassured those on

2   the call that "overall our coverage remains very, very high across all of our key

3   therapeutic areas."

4        52.   And Defendants were aware that insurance coverage had become an

5   issue that investors cared about, as Defendants began reporting the ratio of

6   prescriptions written that were covered by insurance.  For example, on a conference

7   call with analysts on February 22, 2012, Bailey told investors that "coverage of

8   Acthar for nephrotic syndrome continues to be above 85%."

9        53.   Defendants also knew that the insurance carriers' concerns as to the

10   effectiveness of Acthar as a treatment for indications other than IS were beginning

11   to mount.  For example, on July 10, 2012, when it was reported that "insurers'

12   scrutiny could soon be causing sales of Acthar Gel to top out," Defendants publicly

13   and directly rejected the notion, stating that insurance reimbursement continued to

14   be "very good" and was "around 90%."

15        54.   Ultimately, in September 2012, it was revealed that Aetna, the nation's

16   fourth largest insurer, had released its determination that Acthar was not "medically

17   necessary" for any indication other than IS.  The publicity surrounding Aetna's

18   comment served as a catalyst for other insurers to also investigate their

19   reimbursement criteria for Acthar.

20        55.   For example, in December 2012, Blue Cross Blue Shield indicated that

21   it would only consider Acthar to be a "medically necessary" treatment for

22   indications other than IS with evidence of ineffectiveness of other treatment options

23   (i.e., steroids) or adverse reactions to them.  Similarly, in January 2013,

24   UnitedHealthcare issued a policy bulletin announcing that it would require

25   physicians to submit for prior authorization and approval - which "may be subject

26   to medical necessity review"- before administering Acthar for indications other than

27   IS.  As Defendants were well aware, these decisions each impose limitations on

28   insurance coverage - and therefore sales - for Acthar for indications constituting

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

over 90% of Acthar prescriptions, materially impacting Questcor's operations and prospects.

**Insider Trading**

56.    The Insider Trading Defendants capitalized on Defendants' false and misleading statements and manipulation of Questcor's stock price upward like the use of the stock buyback program by selling tens of millions of dollars of their own Questcor common stock at artificially inflated levels during the Trading Period. These insider sales are suspicious both in amount and timing.  These Defendants' insider sales are summarized in the following chart:

| Defendant | Date | Shares | Proceeds |
|---|---|---|---|
| Bailey | Aug. 25, 2011 | 30,000 | $790,890 |
| | Sept. 12, 2011 | 30,000 | $803,035 |
| | Oct. 10, 2011 | 30,000 | $966,156 |
| | Nov. 10, 2011 | 30,000 | $1,232,174 |
| | Dec. 9, 2011 | 30,000 | $1,321,652 |
| | Jan. 10, 2012 | 30,000 | $1,256,100 |
| | Feb. 10, 2012 | 30,000 | $1,044,426 |
| | Mar. 9, 2012 | 30,000 | $1,069,406 |
| | Apr. 10, 2012 | 30,000 | $1,227,600 |
| | May 10, 2012 | 30,000 | $1,189,650 |
| | June 11, 2012 | 30,000 | $1,361,100 |
| | July 10, 2012 | 30,000 | $1,730,401 |
| | Aug. 27, 2012 | 40,000 | $1,722,800 |
| | Sept. 13, 2012 | 40,000 | $2,003,200 |
| | | **440,000** | **$17,718,590** |
| Cartt | May 13, 2011 | 70,400 | $1,600,192 |
| | May 16, 2011 | 79,087 | $1,743,077 |
| | Aug. 4, 2011 | 25,513 | $769,727 |
| | Aug. 10, 2011 | 25,000 | $775,000 |
| | Aug. 11, 2011 | 85,968 | $2,669,758 |
| | Aug. 15, 2011 | 47,155 | $1,485,383 |
| | Oct. 28, 2011 | 139,286 | $5,760,869 |
| | Oct. 31, 2011 | 25,000 | $1,065,000 |
| | Nov. 8, 2011 | 8,100 | $346,275 |
| | | **505,509** | **$16,215,281** |

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

| | | | |
|---|---|---|---|
| Young | Aug. 5, 2011 | 10,000 | $285,000 |
| | Aug. 12, 2011 | 9,308 | $297,856 |
| | Aug. 15, 2011 | 6,092 | $194,944 |
| | Oct. 31, 2011 | 79,724 | $3,272,824 |
| | Apr. 27, 2012 | 70,000 | $2,996,700 |
| | | **175,124** | **$7,047,324** |

57.     The Insider Trading Defendants' stock sales are unusual and suspicious in amount.  As set forth below, these Defendants sold huge percentages of their Questcor holdings at opportune times, and despite having virtually no sales whatsoever in the 18 months leading up to the Trading Period.

| Defendant | Trading Period Shares Sold | Trading Period Proceeds | Total Holdings Before Trading Period Sales | Percentage of Total Holdings Sold |
|---|---|---|---|---|
| Bailey | 440,000 | $17,718,590 | 1,426,608 | 30.84% |
| Cartt | 505,509 | $16,215,281 | 836,384 | 60.44% |
| Young | 175,124 | $7,047,324 | 346,527 | 50.54% |
| Total | 1,120,633 | $40,981,195 | | |

58.     The timing of the Insider Trading Defendants' stock sales was also unusual, particularly when compared to their prior trading history.  They are also suspicious in that they were timed to take advantage of the artificial inflation caused by Defendants' misrepresentations.  Notably, except for a single sale by Defendant Young on November 2, 2010,[6] no sale of Questcor stock was made by any of the Insider Trading Defendants during the approximately year and a half immediately preceding the Trading Period.

59.     Moreover, many of the Insider Trading Defendants' Trading Period sales occurred at times when Questcor was trading at or near historical highs and/or

---

[6]     On November 2, 2010, Young sold 28,125 shares for proceeds of $346,781, which amounted to less than 8% of his holdings.

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1   at times designed to capitalize on their false statements.  For instance, as set forth

2   more fully herein, on October 25, 2011, Defendants announced record quarterly

3   financial results, and that evening Defendants held a conference call with analysts.

4   As a result of their false and misleading statements, the next day the stock climbed

5   more than $7 per share, closing up more than 21%.  Defendants seized this

6   opportunity, selling 244,000 shares over the next two trading days for proceeds of

7   almost $10 million.

8         60.    In addition, at the same time Defendants were unloading many of their

9   shares of Questcor stock during the Trading Period, they were causing the

10   Company to repurchase approximately six million shares at a cost to Questcor of

11   more than $243 million.  For example during the months of April and May 2012,

12   while certain Defendants collectively sold over $5 million of their Questcor stock,

13   Defendants caused the Company to repurchase over 3.6 million shares of Questcor

14   stock at a cost to the Company of over $153 million.  These repurchases had the

15   effect of avoiding further declines and even increasing Questcor's stock price at the

16   same time Defendants' massive insider trading was having a downward effect on

17   the price of Questcor's stock as they cashed out their holdings.

18         61.    Like their insider sales, the Company's stock buy-back was

19   manipulated and suspiciously timed by Defendants to support Defendants' insider

20   sales.  For example, even though the Company was authorized to buy shares prior

21   to the Trading Period - and could have done so at much lower prices - Defendants

22   caused the Company to purchase no stock during 2010.

23                **DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

24                    **ISSUED DURING THE TRADING PERIOD**

25         62.    On April 4, 2011, Questcor issued a release announcing its preliminary

26   first quarter 2011 financial results.  The release stated in part:

27         New, paid prescriptions of H.P. Acthar® Gel (Acthar) for the

28   treatment of exacerbations of multiple sclerosis (MS) during the quarter

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

1   were greater than 500, up over 115% from the year ago period and up

2   over 40% from the prior quarter.

3                                    * * *

4        "The strong performance we saw late in the fourth quarter of 2010

5   has continued in the first quarter of 2011 and was driven by the

6   increasing productivity of our recently expanded Acthar sales force.

7   March showed significant growth in MS prescriptions and exceeded

8   February's record performance by over 50%.  In addition, we are pleased

9   with the very early results from the efforts of our small dedicated

10  Nephrology sales team.  While we are very encouraged by the first

11  quarter new prescription results, we note that prior sharp increases in

12  sequential quarterly Acthar prescriptions have usually been followed by

13  more modest sequential growth," said Don M. Bailey, President and

14  CEO of Questcor Pharmaceuticals.

15       63.    As a result of this news, the market reacted favorably and sent the price

16  of Questcor stock higher, closing on April 5, 2011 at $18 per share.  This represented

17  a one-day increase of more than $3 per share, or 20%.

18       64.    On April 26, 2011, Questcor issued a release announcing its financial

19  results for the first quarter ended March 31, 2011.  The Company reported net

20  income of $11.2 million, earnings per share ("EPS") of $0.17, and net sales of $36.8

21  million for the first quarter of 2011.  The release stated in part:

22       The Company's financial performance was driven by a 120%

23       year-over-year increase in the number of new paid prescriptions of H.P.

24       Acthar® Gel (Acthar) for the treatment of multiple sclerosis (MS)

25       exacerbations. In the first quarter, paid Acthar prescriptions for the

26       treatment of nephrotic syndrome (NS) increased to 18 while

27       prescriptions for the treatment of infantile spasms (IS) were 89, which is

28       within the historic range for IS.

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

"Our strategy to expand the sales force is clearly paying off," said Don M. Bailey, President and CEO of Questcor. "Paid MS prescriptions are up sharply from last quarter. March was a particularly strong month and this momentum has continued so far in April. We believe that Acthar is filling an increasingly important role in the treatment of exacerbations associated with MS and, looking forward, we expect to continue to grow sales in this important therapeutic area."

Mr. Bailey added, "We are also encouraged by the early positive results from our small, dedicated nephrology sales team, which initiated selling efforts at the beginning of March. The number of nephrologists who are using Acthar to treat patients with nephrotic syndrome is increasing."

65. In the release, Defendants specifically highlighted the 2010 Bomback study as a basis for increasing NS sales, stating:

"During March, we initiated a limited selling effort in nephrology *and a peer-reviewed journal published the first clinical data supporting the use of Acthar in the treatment of nephrotic syndrome.* Our NS sales team has generated encouraging early Acthar prescription activity and we are now beginning to explore options for increasing our sales effort in this market," concluded Mr. Cartt.

66. That same day, Questcor hosted a conference call for analysts, media representatives and investors where Defendants reiterated the record financial results reported in the Company's release. Defendant Mulroy discussed the Company's financial performance , while Defendants Bailey and Cartt stated:

[BAILEY:]  In summary, we are off to a very good start this year as we continue to execute our straightforward strategy to sell more Acthar. Our decision to expand the MS sales force is clearly paying off. Also, our nephrotic syndrome sales force is having some early success.

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1                                 * * *

2      [CARTT:]  Our promotional efforts are increasingly focused on two

3 main goals.  One, convincing an increasing number of prescribers about the

4 benefits of using Acthar with their patients and two, helping doctors,

5 nurses and others in their medical practice become more effective at

6 identifying potential Acthar patients.

7                                   * * *

8      *Importantly, the recently published case series paper, combined*

9 *with the clinical data sets expected to be available in November, should*

10 *give us ample tools to grow Acthar prescriptions in nephrology* until we

11 complete the larger Company sponsored phase 4 study that is now

12 underway.

13                                   * * *

14      *[W]e know that the studies have been progressing and what we hear*

15 *from the investigators, and of course these are external studies.  They're*

16 *investigator-sponsored studies . . . [that] we provide grant funding for*

17 *them.*  And the investigators we've talked to, we know that they're - some of

18 them at least are working on wrapping studies up or made significant

19 progress and are planning to present data at ASN in November, so that's

20 really where that comes from.

21      We really can't comment on specifics about the data.  That will

22 come later in the year.

23      67.    On April 27, 2011, Questcor filed with the SEC its Quarterly Report

24 on Form 10-Q for the period ended March 31, 2011.  The Company's Form 10-Q

25 was signed by Defendants Bailey and Mulroy and reaffirmed the Company's

26 financial results previously announced on April 26, 2011.  In addition, the Form 10-

27 Q stated in part:

28

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

During the three months ended March 31, 2011, we achieved a significant increase in the number of prescriptions for Acthar to treat MS exacerbations, which was attributable to our expanded sales force calling on physicians who treat patients with MS.

\* \* \*

Research and development expenses were $3.0 million in the three months ended March 31, 2011, as compared to $2.7 million for the three months ended March 31, 2010. . . . *Costs included in research and development also include costs associated with the funding of medical research projects to better understand the therapeutic benefit of Acthar in current and new therapeutic applications, product development efforts and compliance activities.*

68.    The April 2011 statements in ¶¶ 62, 64-67 above were false and misleading when made.  The true facts which were then known to or recklessly disregarded by Defendants, include:

(a)    That Questcor's reported net sales of $36.8 million, EPS of $0.17, and that the "strong performance" of and "significant growth" in Acthar prescriptions for the first quarter 2011, including 115% in growth in MS indications over the same quarter of 2010, were the result of improper sales and marketing practices, including paying physicians tens of thousands of dollars in "consulting" fees in connection with prescribing Acthar and preparing "investigator-led" studies, and participating in "speaker's bureaus";

(b)    That the 50% growth in paid MS prescriptions between February 2011 and March 2011 was due not to the efficacy or therapeutic benefit of Acthar, but rather to the efforts of physicians paid by Questcor to endorse Acthar;

(c)    That the increase in paid Acthar prescriptions for the treatment of NS was due to the Defendants' dissemination of the results of the 2010 Bomback Study, which study was hopelessly flawed, did not support the use of Acthar for

- 26 -

1   any indication, and was the result of a payment to Bomback of a $50,000

2   "consulting fee;"

3          (d)     That Questcor's "research and development" and "clinical data

4   sets" consisted of medical "studies" that were used to convince physicians to

5   prescribe Acthar, which studies were inherently flawed and did not support the

6   conclusions for which they were being used by Questcor' s sales force;

7          (e)     That Questcor lacked clinical data and scientific evidence to

8   support the sale of Acthar for any indication other than IS, even as a "second-line"

9   therapy;

10          (f)     That Questcor' s reported revenue growth for first quarter 2011

11   was the direct result of the improper practices set forth above which practices were

12   designed to inflate the price of Questcor stock in order to allow Defendants to sell

13   their shares of Questcor stock at artificially inflated prices; and

14          (g)     That as detailed in (a)-(f) above Defendants had no reasonable

15   basis to believe and did not in fact believe their statements in ¶¶ 62, 64-67 above

16   about Questcor' s outlook, including those statements about the effectiveness of and

17   potential market growth for Acthar.

18          69.     On July 26, 2011, Questcor issued a release announcing its financial

19   results for the second quarter ended June 30, 2011.  The Company reported net

20   income of $13.9 million, EPS of $0.21, and net sales of $46.0 million for the

21   second quarter of 2011.  The release stated in part:

22          A 147% year-over-year increase in the number of paid H.P. Acthar®

23          Gel (Acthar) prescriptions for the treatment of multiple sclerosis (MS)

24          exacerbations led to increased shipments of Acthar vials.  Paid Acthar

25          prescriptions for the treatment of nephrotic syndrome (NS) also increased

26          sharply in the quarter.  In addition, paid Acthar prescriptions for the

27          treatment of infantile spasms (IS) were at the highest quarterly level since the

28          third quarter of 2008.

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

1       "Clearly, Questcor had a terrific quarter," said Don M. Bailey,

2   President and CEO of Questcor.  "Our focus on expanding the use of

3   Acthar in the treatment of MS exacerbations drove our record second

4   quarter financial performance.  Importantly, in spite of the rapid

5   expansion in the use of Acthar for MS exacerbations, we believe that the

6   prescriber base can continue to grow.  Accordingly, growing MS sales

7   remains our number one priority.  Also, following our early success in

8   nephrotic syndrome, we are immediately and substantially expanding our

9   nephrology selling effort."

10       70.    After issuing its second quarter 2011 financial results on July 26, 2011,

11   Questcor hosted a conference call for analysts, media representatives and investors

12   where Defendants reiterated the record financial results reported in the Company's

13   press release.  Defendant Mulroy discussed the Company's financial performance,

14   while Defendants Bailey, Cartt and Young also participated in the conference call,

15   stating:

16       [BAILEY:] The exceptional MS and NS sales growth along with a

17   very good IS [infantile spasms], sales quarter naturally led to record Acthar

18   vials shipped, record sales and record earnings.  In addition today, we are

19   announcing the fourth vertical market we aim to develop for Acthar, which is

20   lupus.

21       * * *

22       [CARTT:]  During the quarter we shipped a record 751 paid

23   Acthar prescription for the treatment of MS relapses.  This was an

24   increase of 147% over the year-ago period, and 48% over the previous

25   quarter.  We believe this performance is a strong signal that the sales

26   force continues to gain traction in the MS market at a faster rate than we

27   expected.

28       * * *

- 28 -

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1      Our promotional efforts remain focused on two main goals.  One,
2  convincing an increasing number of prescribers about the benefits of using
3  Acthar with their patients; and two, helping doctors, nurses and others in
4  their medical practice become more effective at identifying the right patients
5  for Acthar.

6      71.    The market reacted favorably to this announcement.  For instance, on
7  July 27, 2011, analyst Caris & Company issued a report entitled "NS Progress Looks
8  Transformational, Lupus Entering Picture ... It's a Whole New Ballgame." The
9  analyst provided a Buy rating and raised its priced target from $30 to $40 per share.
10  Similarly, Oppenheimer & Co. issued a report entitled "Acthar Continues to Outpace
11  Expectations; Increasing [price target] to $35" in which it stated "[w]e continue to
12  expect robust sales growth for Acthar in MS flares and NS and therefore are
13  increasing our Acthar sales estimates and EPS estimates." Defendants' false and
14  misleading statements drove the stock price up $6.50 per share in a single day, or
15  25%, on heavy volume.

16      72.    On July 29, 2011, Questcor filed its Quarterly Report with the SEC on
17  Form 10-Q for the period ended June 30, 2011.  The Company's Form 10-Q was
18  signed by Defendants Bailey and Mulroy and reaffirmed the Company's financial
19  results previously announced on July 26, 2011.   In addition, Defendants
20  commented at length on the Company's "studies."  The Form 10-Q stated in part:

21      We also maintain a research and development program focused on
22      gathering data to: (i) evaluate the proper use of Acthar for on-label
23      indications; (ii) investigate other potential uses of Acthar that are not
24      currently FDA approved indications; and (iii) improve our understanding of
25      how Acthar works in the human body (pharmacology), and ultimately, its
26      mechanism(s) of action in the disease states for which it is currently used, or
27      may be used in the future:

28                              * * *

- 29 -

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

Research and development expenses were $3.9 million in the three months ended June 30, 2011, as compared to $2.9 million for the three months ended June 30, 2010. . . . *Costs included in research and development also include costs associated with the funding of medical research projects to better understand the therapeutic benefit of Acthar in current and new therapeutic applications, product development efforts and compliance activities.*

We plan to continue our research and development efforts to explore the use of Acthar as a therapeutic alternative for the treatment of NS. *In 2010, we supported investigator-initiated studies in patients with idiopathic membranous nephropathy (on-label) and diabetic nephropathy (not on-label).* Based on the results of these investigations, we have started a Phase IV dose response clinical trial for idiopathic membranous nephropathy and are developing a clinical protocol for a Company-sponsored study to evaluate the safety and efficacy of Acthar in treating diabetic nephropathy.

73.     The statements made in ¶¶ 69-70, 72 above were false and misleading when made.  The true facts which were then known to or recklessly disregarded by Defendants, include:

(a)     That Questcor's "record" second quarter 2011 results of net sales Of $46 million and EPS of $0.21 purportedly driven by substantial increases in paid Acthar prescriptions for treatment of NS and MS, including a 140% year-over-year increase in paid MS prescriptions, were not a "strong signal" that Acthar was gaining traction in the MS market, but rather the result of Defendants' improper practices detailed herein;

(b)     That Questcor's "research and development" was not designed to pursue objective tests on the efficacy of Acthar, but rather consisted of scientific or medical "studies" that were designed to and used to convince physicians to prescribe Acthar, which studies were inherently flawed and did not support the

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

1   conclusions for which they were being used by Questcor's sales force;

2              (c)     That the investigator initiated studies relied upon by Defendants

3   as legitimate clinical investigations were not designed to objectively evaluate the

4   safety or efficacy of Acthar, but rather were utilized solely for the sales and

5   marketing of the drug and were, in fact, halted and/ or placed in abeyance when

6   they generated data inconsistent with that which Defendants desired;

7              (d)     That Questcor lacked clinical data and scientific evidence to

8   support the sale of Acthar for any indication other than IS;

9              (e)     That Questcor's reported revenue growth for second quarter

10  2011 was the direct result of the improper practices set forth herein, which practices

11  were designed to inflate the price of Questcor stock in order to allow Defendants to

12  sell their shares of Questcor stock at artificially inflated prices; and

13             (f)     That as detailed in (a)-(e) above Defendants had no reasonable

14  basis to believe and did not in fact believe their statements in ¶¶ 69-70, 72 above

15  about Questcor's outlook, including those statements about the effectiveness of and

16  potential market growth for Acthar.

17       74.    On October 25, 2011, Questcor issued a release announcing its

18  financial results for the third quarter ended September 30, 2011.  The Company

19  reported net income of $22.9 million, EPS of $0.35, and net sales of $59.8 million

20  for the third quarter of 2011.  The release stated in part:

21             "Questcor's strategy to sell more Acthar continues to generate

22             increasing net sales and earnings," said Don M. Bailey, President and

23             CEO of Questcor.  "Our commercial organization is steadily expanding the

24             number of neurologists, nephrologists, and child neurologists prescribing

25             Acthar.  We believe Acthar has the potential to benefit many more MS, NS,

26             IS and possibly lupus patients in the future."

27                                        * * *

28             "In addition, new data on Acthar will be presented in November at

- 31 -

FIRST AMENDED COMPLAINT

the American Society of Nephrology Annual Meeting.  This data will provide further insight into the immune-modulating and other therapeutic properties of Acthar specifically relating to kidney disease.  ***Our emerging understanding of the apparent immune-modulating properties of Acthar encourages us to investigate the potentially broader therapeutic applications of Acthar in other inflammatory and autoimmune diseases, some of which are already on the product label for Acthar," added Mr. Cartt.***

75.    On October 25, 2011, Questcor also hosted a conference call for analysts, media representatives and investors where Defendants reiterated Questcor's record financial results.   Defendant Mulroy discussed the Company's financial performance in depth and Defendants Bailey and Cartt discussed clinical studies, stating:

[CARTT:]  Switching gears to the subject of new scientific data, several Acthar-related abstracts will be presented in November at the annual meeting of the America Society of Nephrology, or ASN, held this year in Philadelphia.  These abstracts are available on ASN's website, www.asn-online.org.  ***The new data provides further insight into the immune-modulating and other therapeutic properties of Acthar specifically relating to kidney disease.***

We believe availability of this data provides further evidence for the direction [sic] action of Acthar on kidney disease.  Importantly, the first three abstracts shown may specifically enhance our near-term selling efforts in nephrology.

76.    On that same conference call, Defendants were asked about insurance coverage for indications other than IS.  Defendant Cartt re-assured investors about continued coverage of Acthar, confirming that coverage by insurers "remains very, very high across all our key therapeutic area[s]," stating:

- 32 -

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

1    [CARTT:] I think overtime payers have given a little more pushback,

2    and this is over the last two to three years.  I think we've gotten increasingly

3    good at targeting the right types of patients and ensuring that the offices are

4    giving the proper documentation for why Acthar is appropriate therapy for

5    those patients.

6    So we're hitting the bull's-eye in terms of patient population that we're

7    driving prescriptions for and we're supporting the offices better.  We are

8    getting better at working with the plans through our reimbursement hub.  So

9    while the insurance companies have over time been a little more resistant,

10   we've been increasingly improving our whole approach to targeting the right

11   kind of patients and supporting the offices.

12   ***So overall, it's kind of a draw between us and the payers and we***

13   ***expect that will be the case going forward.  So, overall our coverage***

14   ***remains very, very high across all of our key therapeutic areas.***

15   77.    Analysts and the market responded favorably to these statements.  For

16   example, on October 25, 2011, Jefferies issued an analyst report entitled "Monster

17   Quarter; Raising [price target] to $44" in which it stated:

18   QCOR reported a stellar quarter driven by Acthar sales in MS and

19   NS.  Sales from the newly expanded nephrology sales force started to impact

20   NS scrips [sic] towards late in Q3, and as a result, we expect this momentum

21   to continue in Q4.  Data will be presented at ASN, and we expect these to

22   help increase Acthar market share in NS.  We have increased our sales

23   estimates and therefore raise our PT to $44 from $36.

24   78.    Similarly, on October 26, 2011, analysts Caris & Company, Maxim

25   Group, Oppenheimer and ThinkEquity each reiterated Buy or Outperform ratings

26   and raised their price targets.  Questcor's stock price spiked again, jumping more

27   than $7 per share, or 21% in one day.

28

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

79.     On October 27, 2011, Questcor filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2011.  The Form 10-Q was signed by Defendants Bailey and Mulroy and reaffirmed the Company's financial results previously announced on October 25, 2011.  In addition, the Form 10-Q stated in part:

We also maintain a research and development program focused on gathering data to: (i) evaluate the proper use of Acthar for on-label indications; (ii) investigate other potential uses of Acthar that are not currently FDA approved indications; and (iii) improve our understanding of how Acthar works in the human body (pharmacology), and ultimately, its mechanism(s) of action in the disease states for which it is currently used, or may be used in the future:

* * *

Research and development expenses were $4.2 million in the three months ended September 30, 2011, as compared to $2.2 million for the three months ended September 30, 2010.... *Costs included in research and development also include costs associated with the funding of medical research projects to better understand the therapeutic benefit of Acthar in current and new therapeutic applications, product development efforts and regulatory compliance activities.*

* * *

We plan to continue our research and development efforts to support the use of Acthar as a therapeutic alternative for the treatment of NS.  *In 2010, we supported investigator-initiated studies in patients with idiopathic membranous nephropathy and because of the results of these investigations, we have started a Phase IV dose response clinical trial for idiopathic membranous nephropathy.*

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

80.     The statements made in ¶¶ 74-76, 79 above were false and misleading when made.  The true facts which were then known to or recklessly disregarded by Defendants, include:

(a)     That the reported net sales of $59.8 million and EPS of $0.35 for the third quarter of 2011 were the result of improper sales and marketing practices, including paying physicians tens of thousands of dollars in "consulting" fees in connections with prescribing Acthar and preparing "investigator-led" studies, participating in "speaker's bureaus," and paying patients as "contractors" to market Acthar to other patients;

(b)     That the $2 million year-over-year increase in Questcor's "research and development" costs reported for the third quarter 2011 consisted of scientific or medical "studies" that were used to convince physicians to prescribe Acthar, which studies were inherently flawed, and were conducted by physicians who agreed to subvert adverse test results by, among other things, cancelling clinical studies when it appeared they would not achieve the results desired by Questcor;

(c)     That Defendants' understanding of Acthar's "immune modulating properties" and "therapeutic benefit" were the result of after-the-fact "studies";

(d)     That Defendants did not believe Acthar had the potential to benefit MS and NS patients, and in fact knew Questcor lacked clinical data and scientific evidence to support the sale of Acthar for any indication other than IS, and Defendants' references to Questcor's "research and development" program, including discussions of ongoing research and "new scientific data" omitted these important facts;

(e)     That because of the more than $23,000 per vial cost charged for Acthar and the rapid growth in prescriptions for indications without a legitimate scientific basis, insurance companies were increasingly skeptical of the use of

- 35 -

1   Acthar as a treatment for MS and NS and increasingly likely to decline coverage,

2   yet Defendants relied on the same defective "studies" to support and assist patients

3   in getting coverage for Acthar therapy, and Defendants' reassuring statements that

4   insurance coverage "remains very, very high" and that Defendants "expect that will

5   be the case going forward" misrepresented this substantial and growing risk;

6      (f) That Questcor's reported revenue growth for third quarter 2011,

7   including "increasing net sales and earnings" was the direct result of the improper

8   practices set forth herein, which practices were designed to inflate the price of

9   Questcor stock in order to allow Defendants to sell their shares of Questcor stock at

10   artificially inflated prices; and

11      (g) That Defendants had no reasonable basis to believe and did not

12   believe their positive statements about Questcor's outlook, including those

13   statements about the effectiveness and potential market growth for Acthar.

14     81. On January 11, 2012, *TheStreetSweeper.org*, a website noted for

15   unearthing corporate fraud in public companies, announced that it had initiated a

16   short position in Questcor. *TheStreetsweeper.org* further reported that it intended

17   to issue the first article in a two-part investigative series about Questcor in the

18   following week. According to *TheStreetsweeper.org*, it had discovered "serious

19   questions about the aggressive marketing practices that QCOR has used to generate

20   explosive – but potentially unsustainable - growth in prescriptions for its only

21   drug." *TheStreetsweeper.org* also indicated that a "second story [will] further

22   examine[] QCOR' s business practices, while taking a hard look at the leaders who

23   have struck it rich as a result of the company's controversial growth strategy."

24     82. Following the *TheStreetSweeperorg* announcement, Questcor's stock

25   fell $6.20 per share from a closing price of $41.54 per share on January 10, 2012 to

26   close at $35.34 per share on January 11, 2012, a one-day decline of 15% on

27   unusually high volume.

28

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

83.    Questcor responded immediately by attempting to refute the assertions made by *TheStreetSweeper.org* and defend the Company's business practices.  As a result, Questcor's stock continued to trade at artificially inflated levels.

84.    First, on January 11, 2012,  Questcor responded to the *TheStreetSweeper.org* revelations by issuing a release entitled "Questcor Pharmaceuticals Issues Statement," which repeatedly and falsely claimed Questcor complied with regulatory and industry standards: Questcor issued a press release entitled "Questcor Pharmaceuticals Issues Statement," which stated in part:

> Questcor Pharmaceuticals, Inc. (NASDAQ:QCOR) today announced it became aware that an investor blog is preparing to issue a report regarding the Company's marketing and business practices.  Questcor issued the following statement:
>
> ***The Company believes that its marketing and business practices are consistent with regulatory requirements and industry standard practices.***  Questcor markets H.P. Acthar® Gel for the treatment of acute exacerbations of multiple sclerosis (MS) in adults, the treatment of nephrotic syndrome, and the treatment of infantile spasms in children under two years of age. ***The Company maintains a compliance program, which is led by an experienced compliance officer and includes the active participation of Questcor's executive management team.***  Questcor attributes its success to the ability of Acthar to potentially address the unmet medical need associated with MS exacerbations and nephrotic syndrome. ***The Company is committed to providing access to Acthar to patients who need it, and marketing Acthar in accordance with regulatory requirements and industry standard practices.***  Questcor plans to speak with the publication to discuss the Company and its marketing and business practices.

85.    Analysts believed Defendants and immediately came to Questcor's defense.  On January 12, 2012, analysts issued reports reiterating Questcor's claims

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

in opposition to those made in the *TheStreetSweeper.org* article. For example, Ladenburg Thalmann stated that "[w]e believe the probability QCOR has inappropriate marketing as a business practices is low. It is our opinion QCOR's management is ethical and QCOR's label allows for QCOR's marketing in the indications of the Company's current focus." Similarly, Maxim Group stated "[o]ur recent discussion with management indicated that QCOR has experienced executives lead its compliance program and is actively trying to ensure appropriate selling and marketing operations."

86.    Then, on January 13, 2012, the day following the article's publication, Questcor arranged for one of its paid physician "consultants," Dr. Bomback, to upload a video on www.youtube.com in support of Questcor's marketing and insurance coverage efforts of Acthar as a treatment for NS. In the video, Dr. Bomback states his 2010 study suggests that "Acthar gel may be a particularly promising therapy for idiopathic membranous nephropathy and in particular for idiopathic membranous nephropathy that is resistant to prior immunosuppressive therapy." As of the filing of this Complaint, the video could be accessed via the Internet at http://www. youtube.com/watch ?feature=player _ detailpage&v=8MdiK 13 iAol.

87.    On January 16, 2012, Questcor issued another release entitled "Questcor Pharmaceuticals Responds to Questions from Investor Blog" in which Questcor set forth its responses to questions provided to the Company by *TheStreetSweeper.org* on January 9, 2012. The release stated in part:

Does Questcor offer any financial incentives to healthcare providers who use Acthar (such as price discounts or free samples of the drug)? If so, please explain.

Questcor Response: ***The Company does not provide financial incentives to doctors or other healthcare practitioners to prescribe Acthar***. On rare occasions we have provided an Acthar sample to a very small

- 38 -

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1   number of doctors at their request.  Providing product samples is of course a

2   very common, accepted practice in the pharmaceutical industry.

3                                   * * *

4          How much scientific evidence does Questcor have to support Acthar

5   as an effective treatment for NS? Please describe any modern clinical studies

6   (such as the Bomback case review) that have been completed in this area so

7   far.

8          Questcor Response: In addition to a formal approval from FDA, there

9   is a growing body of more recent scientific data supporting the use of Acthar

10  to treat proteinuria in nephrotic syndrome.  For example, a retrospective case

11  series publication by Bomback et al. which included a review of treatment

12  results for patients treated with Acthar via prescription showed that in a

13  subset of 10 patients with nephrotic syndrome due to idiopathic membranous

14  nephropathy, 80% achieved a complete or partial remission of proteinuria.

15  More recently, at the 44th Annual Meeting of the American Society of

16  Nephrology in November 2011, Boston University Assistant Professor of

17  Medicine Dr. Laurence H. Beck, Jr., M.D., Ph.D. presented results from a

18  study which found that Acthar may induce a remission of proteinuria in

19  patients with nephrotic syndrome due to idiopathic membranous nephropathy

20  by suppressing production of antibodies to the phospholipase A2 receptor.

21  Separately, results from a prospective clinical study at Columbia University

22  conducted by Appel et al., were presented at the 2011 American Society of

23  Nephrology Annual Meeting.  This study found that 47% (7 of 15) of patients

24  suffering from nephrotic syndrome due to various etiologies and who were

25  unsuccessfully treated with one or more other therapies were either partial or

26  complete responders to Acthar treatment as defined by the level of

27  proteinuria.  Nonetheless, the Company has been clear in warning investors

28  of the limited scientific evidence in this area, as it did in its most recent

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

Annual Report on Form 10-K, as follows:

"There is limited data on the efficacy of Acthar in the treatment of nephrotic syndrome. It is unclear what amount of clinical or other data physicians will require prior to deciding whether or not to use Acthar in the treatment of nephrotic syndrome."

\* \* \*

Please describe any past/current financial arrangements between Questcor and Bomback.

Questcor Response: *Questcor has no current financial arrangements with Dr. Bomback . As Questcor was learning about the nephrology field and beginning to speak with nephrologists about Acthar, Dr. Bomback was a consultant to the Company with financial arrangements that were within industry norms.*

\* \* \*

At this point in the conversation, Michael Mulroy, Questcor's Chief Compliance Officer, made the following statement: "In light of StreetSweeper's unclear background, motives and tactics, Questcor does not intend to engage in an ongoing dialog with StreetSweeper and makes no commitment to respond to any further questions. We believe that substantially all of the information requested in StreetSweeper's questions is already in the public domain. *We take our marketing and business practices very seriously. Questcor has a standard compliance program. I am the Chief Compliance Officer and we have another compliance officer within the Company with 10 years of pharmaceutical compliance experience whose sole job is to design and execute our ongoing compliance efforts. We are in substantial compliance with the PhRMA Code on Interactions with Healthcare Professionals. If we become aware of any unacceptable practices from outside parties or our normal ongoing compliance program*

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1    *we will of course deal with any such matters in a responsible manner."*

2        88.    The statements made by Defendants in January 2012, in ¶¶ 84, 86-87

3    above were false and misleading when made.  The true facts which were then

4    known to or recklessly disregarded by Defendants, include:

5            (a)    That the "modern clinical trials" supporting the use of Acthar for

6    NS were: (i) conducted via an *ex post* review sample of just ten patients by a

7    physician who had been paid handsomely; (ii) the result of a study which found that

8    at best Acthar "may induce" remission of proteinuria in NS; (iii) a prospective study

9    whose population totaled just 15 patients, the majority of whom showed no benefit

10   from the treatment of Acthar, and concluded that the results might warrant further

11   investigation of Acthar as a third-line or fourth-line treatment; and (iv) other studies

12   had been commenced but not completed because they were not achieving the

13   results desired by Questcor;

14           (b)    That Questcor was paying physicians large consulting fees to

15   encourage them to write prescriptions and to market Acthar to other physicians, and

16   paying patients as consultants to encourage other patients to try Acthar as set forth

17   more fully in ¶¶ 4-7, 31-38 above;

18           (c)    That Questcor did, in fact, "provide financial incentives to

19   doctors or other healthcare practitioners" through funded studies and "speakers

20   bureaus" to encourage them to prescribe Acthar; and

21           (d)    That Defendants were profiting from their misconduct by selling

22   Questcor stock at artificially inflated prices while in possession of material, non-

23   public information.

24       89.    On February 3, 2012, Questcor issued a release announcing its

25   preliminary fourth quarter and full year 2011 financial results.  The release

26   reiterated that Questcor **"committed to providing access to Acthar to patients**

27   **who need it, and marketing Acthar in accordance with regulatory**

28   **requirements and industry standard practices."**

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

90. On February 22, 2012, Questcor issued a release announcing its financial results for the fourth quarter and full year ended December 31, 2011. The Company reported net income of $31.6 million, EPS of $0.48, and net sales of $75.5 million for the quarter, as well as net sales of $218.2 million, net income of $79.6 million and EPS of $1.21 for the fiscal year. The release stated in part:

> "Net sales growth in the fourth quarter was driven by the increasing numbers of physicians who are recognizing the potential for Acthar to help patients with MS and NS," said Don M. Bailey, President and CEO of Questcor. "We are particularly encouraged by the growing number of physicians who recognize the therapeutic value of Acthar in their practices, especially for those patients who have not adequately responded to other treatments. At the same time, we are continuing to build our understanding of the potential immune-modulating properties of Acthar, and are considering how best to study the broader possible therapeutic applications in other inflammatory and autoimmune diseases, many of which are already in the list of approved indications on the Acthar label."

91. After issuing its fourth quarter and full year 2011 financial results on February 22, 2012, Questcor hosted a conference call for analysts, media representatives and investors where Defendants reiterated the record financial results reported in the Company's release. Defendants Mulroy, Bailey, Cartt and Young participated in the call.

92. Bailey sought to assure investors that the Company was complying with industry standards and applicable regulations, stating:

> *A recent compliance review confirmed that our promotional programs and activities meet all applicable laws and regulations. With our outlook for sustained growth, this new committee is part of our effort to put the infrastructure in place to make sure we continue to build Questcor the right way, as we have been doing since the new Management team was put*

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1     *in place in 2007.*

2        93.    Similarly, Cartt sought to reassure investors that insurance coverage

3 for Acthar was robust and not a concern, stating:

4          ***Our reimbursement team speaks with insurers multiple times daily***

5          ***And all indicators are that insurance coverage for Acthar and***

6          ***nephrotic syndrome should remain very strong.***

7        94.    Later in the same call, Bailey again sought to reassure investors that

8 the Company was operating legitimately and coverage of Acthar by insurers was

9 not a risk, stating:

10          Before providing a little overall perspective on the value drivers for

11          Questcor, I wanted to briefly address some of the rumors that we are being

12          told are being spread by members of the short-selling community.

13          . . . The next rumor was that Questcor was the subject, or soon to

14          become the subject, of one or more government investigations.  In reality, we

15          have no knowledge of any government investigation.  We have not been

16          contacted by any government agency regarding an actual or potential

17          investigation.  ***Furthermore, our recent compliance review found no***

18          ***violations of policy, guidance, or law. . . .***

19          . . . We have also heard the rumor that insurance companies are

20          stopping their coverage of Acthar for nephrotic syndrome.  As Steve

21          reported, ***coverage of Acthar for nephrotic syndrome continues to be***

22          ***above 85%.***

23        95.    Also on February 22, 2012, Questcor filed with the SEC its Annual

24 Report on Form 10-K for the year ended December 31, 2011.  The Form 10-K was

25 signed by Defendants Bailey and Mulroy and reaffirmed the Company's financial

26 results previously announced.  In addition, the Form 10-K stated in part:

27          We maintain a research and development program focused on

28          gathering data to: (i) evaluate the use of Acthar for certain on-label

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

indications; (ii) investigate other potential uses of Acthar for indications not currently FDA approved; and (iii) expand our understanding of how Acthar works in the human body (pharmacology), and ultimately, its mechanism(s) of action in the disease states for which it is currently used, or may be used in the future:

* * *

Research and development expenses were $16.8 million in 2011, as compared to $10.9 million in 2010 and $9.7 million in 2009. . . . *Costs included in research and development also include costs associated with the funding of medical research projects to expand our knowledge of the therapeutic benefit of Acthar in current and new therapeutic applications, product development efforts and regulatory compliance activities.*

96.     On March 4, 2012, Analyst Caris & Company issued a report entitled "Meeting with Don: Plenty of Room to Grow and Doing Things the Right Way" in which it reported that it had recently spoken with defendant Bailey.  The report discussed Questcor's ongoing clinical studies, stating that "[c]linical data coming in the not too distant future in addition to the original patient case series from late 2010/early 2011: the Columbia study that was released at ASN last November should be published in a journal in the coming months and a small Mayo Clinic study looking at proteinuria response to low/high dose regimens should yield results in 2012."  The report additionally provided that "QCOR emphasizes an ongoing commitment to sales/marketing compliance" and [i]n our view, QCOR's ongoing commitment to this effort is readily apparent, and the company is serious about identifying and correcting any shortcomings."

97.     The statements made in ¶¶ 89-95 above were false and misleading when made.  The true facts which were then known to or recklessly disregarded by Defendants, include:

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

1          (a)     That Questcor's reported fourth quarter 2011 sales and EPS were

2    not the result of a "growing number of physicians who recognize the therapeutic

3    value of Acthar," but instead were the result of improper sales and marketing

4    practices, including paying physicians tens of thousands of dollars in "consulting"

5    fees in connection with prescribing Acthar and preparing "investigator-led" studies,

6    participating in "speaker's bureaus," and paying patients as "contractors" to market

7    Acthar to other patients;

8          (b)     That Questcor's $5.9 million increase in "research and

9    development" costs represented scientific or medical "studies" that were used to

10   convince physicians to prescribe Acthar, but which studies were inherently flawed

11   as they were conducted by physicians who agreed to subvert adverse test results by,

12   among other things, cancelling clinical studies when it appeared they would not

13   achieve the desired results;

14         (c)     That insurance companies were increasingly skeptical of the use

15   of Acthar as a treatment for MS and NS and because of the practices detailed

16   herein, Defendants knew that "coverage of Acthar for nephrotic syndrome ... above

17   85%" would not "remain very strong," and in fact could not continue;

18         (d)     That Questcor's reported revenue growth for fourth quarter

19   2011 and fiscal year 2011 was the direct result of the improper practices set forth

20   above, which were designed to inflate the price of Questcor's stock in order to allow

21   Defendants to sell their shares of Questcor stock at artificially inflated prices; and

22         (e)     That Defendants had no reasonable basis to believe and did not

23   believe their positive statements about Questcor's outlook, including those

24   statements about the effectiveness and potential market growth for Acthar.

25         98.     On April 24, 2012, Questcor issued a release announcing its financial

26   results for the first quarter ended March 31, 2012.  The Company reported net

27   income of $38.5 million, EPS of $0.58, and net sales of $96.0 million for the

28   quarter.  The release stated in part:

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, Ca 90048

"While our substantial NS commercial effort only began in the fourth quarter of 2011, the value of NS shipped prescriptions now exceeds that of MS," said Don M. Bailey, President and CEO of Questcor.  "This faster-than-expected NS growth drove us to further expand the NS commercial effort prior to the additional expansion of our MS commercial team."  At the same time, *we continue to increase our investment in efforts to learn about the possible therapeutic applications of Acthar in other inflammatory and autoimmune diseases as well as increase investments in our management systems, internal control, and compliance infrastructure."*

* * *

"We have been expanding our scientific efforts and R&D investments in Acthar, and expect that we will continue to increase spending to support Questcor's future growth," commented Dr. David Young, Chief Scientific Officer.

99.     After issuing its first quarter 2012 financial results on April 24, 2012, Questcor hosted a conference call for analysts, media representatives and investors where Defendants reiterated the results reported in the Company's release. Defendant Mulroy discussed the Company's financial performance and Defendants Bailey and Cartt stated:

[BAILEY:] Questcor's unconventional but simple business model continues to produce excellent financial results.  We continue to expand nephrologist and neurologist awareness of patient benefits from Acthar, and as a result paid prescriptions continue to increase.  Driving our growth in the first quarter was the strong increase in paid prescriptions written by nephrologists to treat patients with nephrotic syndrome, a serious kidney ailment.  After a successful pilot program, we stepped up our nephrology commercial effort last October.  The expected revenues from nephrotic syndrome prescriptions are accelerating to the point that, by our calculation,

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1   nephritic syndrome scrip value now exceeds MS.

2   * * *

3   [CARTT:]  *Insurance reimbursements for Acthar in nephrotic*

4   *syndrome continues to be very good, with more than 85% of private*

5   *insurance prescriptions covered.  We attribute this continued strong*

6   *coverage to the severity of the health outcome if nephrotic syndrome is not*

7   *adequately treated, coupled with the fact that Acthar is indicated and*

8   *approved in this condition, and there are few other treatment options.*

9   *Further supporting both coverage and prescribing activity is the ongoing*

10  *flow of positive results coming from the various studies we are funding.*

11  * * *

12  *So everything looks positive from our standpoint. The insurance*

13  *coverage is good.*  The docs in general are trying out Acthar in their first one

14  or two patients, and seeing how those patients do.  Of course, it takes them

15  six months or so, to see the results, but - and we're- at this point, now that

16  we're two full quarters into it with our sales force of 28, we're seeing some

17  repeat prescriber[s].  And we expect to see that increase as we go forward.

18  *No red flags from our standpoint.  Everything looks quite encouraging.*

19  * * *

20  [BAILEY:] *[B]asically the writers are writing, the payers are paying,*

21  *and everything's good there.*

22  100.   On April 26, 2012, Questcor filed with the SEC its Quarterly Report

23  on Form 10-Q for the period ended March 31, 2012.  The Form 10-Q was signed by

24  Defendants Bailey and Mulroy, and reaffirmed the Company's financial results

25  previously announced on April 24, 2012.  In addition, the Form 10-Q stated in part:

26  We maintain a research and development program focused on

27  gathering data to: (i) evaluate the use of Acthar for certain on-label

28  indications; (ii) investigate other potential uses of Acthar for indications not

- 47 -

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1    currently FDA approved; and (iii) expand our understanding of how Acthar

2    works in the human body (pharmacology), and ultimately, its mechanism(s)

3    of action in the disease states for which it is currently used, or may be used in

4    the future:

5                                    * * *

6         Research and development expenses were $5.7 million in the three

7    months ended March 31, 2012, as compared to $3.0 million for the three

8    months ended March 31, 2011. . . . *Costs included in research and*

9    *development also include costs associated with the funding of medical*

10   *research projects to better understand the therapeutic benefit of Acthar in*

11   *current and new therapeutic applications, product development efforts and*

12   *regulatory compliance activities.*

13        101.    The statements made in ¶¶ 98-100 above were false and misleading

14   when made.  The true facts which were known to or recklessly disregarded by

15   Defendants, includes:

16             (a)    That Questcor's reported first quarter 2012 sales and EPS were

17   not the result of "nephrologist and neurologist awareness of patient benefits from

18   Acthar," as Defendants claimed, but rather were the result of improper sales and

19   marketing practices, including paying physicians tens of thousands of dollars in

20   "consulting" fees in connection with prescribing Acthar and preparing

21   "investigator-led" studies, participating in "speaker's bureaus," and paying patients

22   as "contractors" to market Acthar to other patients;

23             (b)    That as a result of the practices detailed in (a) above, Questcor's

24   operations and results were neither "good," "positive" nor "encouraging," as

25   Defendants' practices had exposed Questcor to a substantial likelihood of

26   government investigation and a substantial likelihood that insurers would not cover

27   Acthar for indications other than IS;

28

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

(c)     That Questcor's expanded "scientific efforts and research and development" consisted of "studies" used to convince physicians to prescribe Acthar, which studies were inherently flawed and were conducted by physicians who agreed to subvert adverse test results by, among other things, cancelling clinical studies when it appeared they would not achieve the desired results;

(d)     That Questcor lacked clinical data and scientific evidence to support the sale of Acthar for any indication other than IS, and the studies relied upon by Questcor did not "support[] both coverage and prescribing activity" as claimed;

(e)     That because Defendants knew there was no clinical or scientific basis supporting the use of Acthar rather than corticosteroids, insurance companies were increasingly skeptical of the use of Acthar as a treatment for MS and NS and because of the practices detailed herein, Defendants knew that "[i]nsurance reimbursements for Acthar in [NS] continues to be very good," and coverage of "more than 85%" could not continue;

(f)     That Questcor's reported revenue growth for first quarter 2012 was the direct result of the improper practices set forth above, which were designed to inflate the price of Questcor stock in order to allow Defendants to sell their shares of Questcor stock at artificially inflated prices; and

(g)     That as a result of (a)-(f) above, Defendants had no reasonable basis to believe and did not believe their positive statements about Questcor's outlook, including those statements about the effectiveness and potential market growth for Acthar.

102.   On July 9, 2012, Questcor's stock reached an all-time high closing at $57.64 per share.

103.   On July 10, 2012, Citron issued an in-depth research report entitled *Questcor: A Single Digit Stock in 18 Months or Less and Here's Why*.  More specifically, the Citron report addressed the lack of credible scientific data to

- 49 -

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1    support Questcor's aggressive strategy to expand the use of Acthar for indications
2    other than IS.  In addition, the research report analyzed the Company's marketing
3    expenses and questioned how the drug was being marketed to doctors, noting that
4    "[t]he sales and marketing for HP Acthar Gel is now up to $6,100 a vial . . . *more*
5    *than 5 X the original price of the drug before Questcor became involved."*  The
6    Citron report further addressed the lack of meaningful research and development at
7    Questcor, and the fact that, "[j]ust the insider selling over the last year represents
8    more cash than Questcor has spent on research and development over its entire
9    lifespan."  Finally, the Citron report raised concerns over insurance reimbursement
10   for Acthar for indications beyond IS, specifically noting "the company's push into
11   new indications despite poor scientific justification" and that "insurers' scrutiny
12   could soon be causing sales of Acthar Gel to top out."

13          104.   Following the Citron report, Questcor's stock fell $12.57 per share to
14   close at $45.07 per share on July 10, 2012, a one-day decline of nearly 22% on
15   unusually high volume.  Despite the serious allegations raised in the Citron report,
16   Defendants continued to defend Acthar and maintain their improper practices while
17   disregarding the lack of clinical data supporting its effectiveness.

18          105.   Moreover, analysts once again came to Questcor's defense in response
19   to the Citron report.  For example, on July 11, 2012, Jefferies & Co. issued a report
20   entitled "It's Groundhog Day In July - Citron Report Rehashes Old Arguments,"
21   stating "[d]espite being voluminous, in our view the Citron report rehashes old bear
22   arguments on QCOR and Acthar including competitive threats, and the lack of
23   clinical data and IP protection."  Similarly, analyst ThinkEquity issued a report
24   entitled "QCOR: We Continue to See QCOR as Our Top Pick in Specialty
25   Pharma," stating "[w]e have reviewed the report and we find little new in the latest
26   9-point report that hadn't been said already in the January 9-point StreetSweeper
27   report .... Maintains Buy rating, $58 [price target]."  As a result, Questcor's stock
28   continued to trade at artificially inflated prices despite Citron's allegations.

- 50 -

106.   On July 24, 2012, Questcor issued a release announcing its financial results for the second quarter ended June 30, 2012.  The Company reported net income of $41.5 million, EPS of $0.65, and net sales of $112.5 million for the second quarter of 2012.

107.   After issuing its second quarter 2012 financial results on July 24, 2012, Questcor hosted a conference call for analysts, media representatives and investors where Defendants reiterated the financial results reported in the Company's press release.  Defendant Mulroy discussed the Company's financial Performance. Defendants Bailey, Cartt and Young also addressed investors.  Bailey commented on the Company's earnings growth, stating:

> [BAILEY:] Questcor's financial results were driven by the increasing acceptance of Acthar among nephrologists and neurologists, as evidenced by the continued growth in nephrotic syndrome and MS paid prescriptions. These two uses of Acthar are now each at annualized sales of approximately $200 million.

108.   Cartt addressed investor concerns over insurance coverage for Acthar, stating:

> ***Insurance reimbursement continues to be very good for Acthar in nephrotic syndrome, with about 90% of prescriptions covered by insurance.*** We attribute this continued strong coverage to the severity of the health outcome if nephrotic syndrome is not adequately treated, coupled with the fact that Acthar is indicated and approved in this condition.
>
> * * *
>
> ***In terms of reimbursement in nephrotic syndrome, it remains very, very strong.***  The payers, in fact, are becoming more accustomed now, as you would expect, to see nephrotic syndrome prescriptions, whereas several months ago there were - for a lot of payers, they were still new.  Just seeing their first one or two or handful, but now they're becoming more accustomed

1   to seeing them. ***And our coverage rates are remaining very strong. We're***
2   ***up at around 90% coverage. We see no indication that that's changing at***
3   ***all and are monitoring it closely. You know, we speak with payers, literally,***
4   ***on a daily basis as we work the prescriptions through our reimbursement***
5   ***hub, and we're seeing no indication there's any slow down in coverage***
6   ***whatsoever there.***

7   109.   Young addressed the clinical evidence Defendants used to support
8   Acthar sales and insurance reimbursement efforts, stating:

9       As you can see by our operating results reported in today's press
10      release, we have been increasing our investment in research and development
11      to better understand the unique immunomodulator and anti-inflammatory
12      properties of Acthar Gel.  Our subjects - our objectives are to produce
13      additional supporting data for the commercial team for on-label indications
14      and to expand our Acthar Gel used through FDA beyond current on-label
15      indications.  Surprisingly, previous owners of Acthar Gel in the
16      pharmaceutical industry in general have not invested in ACTH-based
17      research.  Therefore, there are many research areas that still need to be
18      assessed by our R&D group in order to better understand ACTH in the
19      clinical role of Acthar Gel.

20      110.   On July 25, 2012, Questcor filed with the SEC its Quarterly Report on
21  Form 10-Q for the period ended June 30, 2012.  The Form 10-Q was signed by
22  Defendants Bailey and Mulroy and reaffirmed the Company's financial results
23  previously announced on July 24, 2012.  In addition, the Form 10-Q stated in part:

24      In the quarter ended June 30, 2012, our expanded Nephrology Sales
25      Force effort resulted in 314 new, paid NS prescriptions, a significant increase
26      over the 45 new, paid NS prescriptions in the quarter ended June 30, 2011.
27      During the three months ended June 30, 2012, the number of new, paid
28      prescriptions for Acthar to treat MS exacerbations increased to 1,110 from

- 52 -

751 in the quarter ended June 30, 2011, which was attributable to increased physician awareness of the therapeutic role of Acthar.

* * *

We maintain a research and development program focused on gathering data to: (i) evaluate the use of Acthar for certain on-label indications; (ii) investigate other potential uses of Acthar for indications not currently FDA approved; and (iii) expand our understanding of how Acthar works in the human body (pharmacology), and ultimately, its mechanism(s) of action in the disease states for which it is currently used, or may be used in the future:

* * *

Research and development expenses were $8.5 million in the three months ended June 30, 2012, as compared to $3.9 million for the three months ended June 30, 2011.... *Costs included in research and development also include costs associated with the funding of medical research projects to better understand the therapeutic benefit of Acthar in current and new therapeutic applications, product development efforts and regulatory compliance activities.*

111.   The statements made in ¶¶ 106-110 above were false and misleading when made.  The true facts which were known to or recklessly disregarded by Defendants, includes:

(a)     That the reported net sales of $112.5 million and EPS of $0.65, and the 1,100 reported new paid prescription for MS and the 314 reported new paid prescriptions for NS were not the result of "increasing acceptance of Acthar among nephrologists and neurologists" as claimed by Defendants, but rather were the result of improper sales and marketing practices, including paying physicians tens of thousands of dollars in "consulting" fees in connection with prescribing Acthar and preparing "investigator-led" studies, participating in "speaker's bureaus," and

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1    paying patients as "contractors" to market Acthar to other patients;

2          (b)    That Questcor's "research and development" was not designed

3    "to better understand the unique immunomodulator and anti-inflammatory

4    properties of Acthar Gel," but rather consisted of "studies" that were designed and

5    used to convince physicians to prescribe Acthar, but which studies were inherently

6    flawed and conducted by physicians who agreed to subvert adverse test results by,

7    among other things, cancelling clinical studies when it appeared they would not

8    achieve the desired results;

9          (c)    That Questcor still lacked clinical data and scientific evidence to

10   support the sale of Acthar for any indication other than IS, and Defendants'

11   discussions of "increasing our investment in research and development" omitted

12   these important facts;

13         (d)    That because Defendants knew there was no valid clinical or

14   scientific basis supporting the use of Acthar rather than corticosteroids, insurance

15   companies were increasingly skeptical to approve the use of Acthar as a treatment

16   for MS and NS and because of the practices detailed herein, Defendants knew that

17   insurance reimbursement would not continue to be "very, very strong for Acthar in

18   nephrotic syndrome," or result in "90% coverage;"

19         (e)    That Questcor's reported revenue growth for second quarter

20   2012 was the direct result of the improper practices set forth above, which were

21   designed to inflate the price of Questcor stock in order to allow Defendants to sell

22   their shares of Questcor stock at artificially inflated prices; and

23         (f)    That as a result of (a)-(e) above, Defendants had no reasonable

24   basis to believe and did not believe their positive statements about Questcor's

25   outlook, including those statements about the effectiveness and potential market

26   growth for Acthar.

27

28

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

**THE TRUTH EMERGES THROUGH A SERIES OF DISCLOSURES**

112.   As discussed in ¶¶ 81-87 and ¶¶ 103-105 above questions regarding Acthar's efficacy and Questcor's promotion practices first began to arise in January 2012 with the *Streetsweeper* report, and again in July 2012 with the Citron report. However, due to Questcor's vigorous public defense of the Company's business practices and continued false and misleading statements in response to and in the face of these allegations, Questcor's stock remained artificially inflated until September 2012.

113.   Then, on September 19, 2012, it was reported that Aetna, one of the nation's largest insurers, had issued on September 14, 2012, a clinical policy bulletin revising its policies concerning Acthar which would severely limit its coverage of Questcor's primary drug because "Aetna has disclosed that after studies and review of scientific literature, it finds *no proof of efficacy* to substantiate reimbursement for Acthar, except for Infantile Spasms (West Syndrome)."  More specifically, Aetna's Clinical Policy Bulletin entitled Repository Corticotropin Injection (H.P. Acthar Gel), Number: 0762, stated in part:

> I.     Aetna considers repository corticotropin (H.P. Acthar® Gel) medically necessary for West syndrome (infantile spasms)
>
> II.     Aetna considers repository corticotropin *not* medically necessary for diagnostic testing of adrenocortical function because it has not been shown to be superior to cosyntropin for this purpose.
>
> III.     Aetna considers repository corticotropin *not* medically necessary for corticosteroid-responsive conditions because it has not been proven to be more effective than corticosteroids for these indications.
>
> IV.     Aetna considers repository corticotropin *experimental* and *investigational for all other indications because its effectiveness for these indications has not been established.*

The Policy Bulletin went on to state "[t]here are a lack of clinical studies

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

comparing the effectiveness of ACTH gel to corticosteroids in corticosteroid-responsive conditions. ***In addition, there is no reliable evidence of the effectiveness of ACTH gel in persons who have failed to respond to corticosteroids.***" Perhaps even more troubling, Aetna stated that "***because of uncertainties in the effect of ACTH gel on the magnitude of endogenous cortisol production, ACTH gel has the potential for inducing significant adverse effects.***"

114.   Also, on September 19, 2012, *Bloomberg* reported that according to Aetna spokesperson Cynthia Michener, Aetna "had made its decision based on a lack of clinical evidence that the drug is more effective than steroids . . . . '***We now state that it is not medically necessary because there is no clinical evidence that the drug is more effective than steroids.***'"

115.   In response to this news, Questcor's stock plummeted $24.17 per share to close at $26.35 per share on September 19, 2012, a one-day decline of nearly 48% on massive volume.

116.   Finally, on September 24, 2012, Questcor filed a Form 8-K with the SEC in which it admitted that the U.S. government had initiated an investigation into the Company's promotional practices.  While Questcor did not provide additional details with respect to the U.S. government investigation, analysts issued reports that same week raising the concern that Questcor was paying "too-high honorarium" to prescribing doctors which has the appearance for "paying for Rx's" or kickbacks to prescribing physicians.

117.   In response to this news, Questcor's stock dropped an additional $11.05 per share to close at $19.08 per share on September 24, 2012, a decline of 37% on high volume.

118.   Aetna's rejection of coverage of Acthar for uses other than IS based on a lack of clinical data was followed on December 28, 2012, by Blue Cross Blue Shield of Michigan's announcement that it would not provide coverage for Acthar for any indication other than IS - causing the stock price to plunge more than 7%

- 56 -

1  that day.  Then, on January 2, 2013, it was disclosed that UnitedHealthcare had

2  issued a bulletin to treating physicians and facilities changing its "advanced

3  notification review process" for Acthar prescriptions.  Specifically, as of April, all

4  participating network physicians will be required to submit for prior authorization

5  review and approval prior to administration of Acthar for members with

6  UnitedHealthcare commercial coverage plans, including those members currently

7  on therapy.  And these requests may be subject to "medical necessity review" to

8  determine coverage.  On that announcement Questcor's stock price again fell.

9      119.  Defendants' false and misleading statements during the Trading Period

10  had the desired effect of inflating the price of Questcor stock to as high as $57 per

11  share and allowed Defendants to sell more than $40 million of their own stock.

12  However, after the above revelations leaked into the market, the Company's shares

13  were hammered by massive sales, sending them down approximately 67% from

14  their Trading Period high.  The declines have resulted in significant economic

15  losses for Plaintiffs.

16                          **LOSS CAUSATION**

17      120.  During the Trading Period, as detailed herein, Defendants made false

18  and misleading statements and engaged in a fraudulent scheme and wrongful course

19  of business which was designed to and did artificially inflate the price of Questcor

20  securities and operated as a fraud or deceit on Plaintiffs, as traders/sellers of put

21  options of Questcor.  Later, as the Defendants' misconduct became apparent to the

22  market, the price of Questcor securities fell precipitously, as the prior artificial

23  inflation came out of the price.  As a result of Plaintiffs' trading and sale of put

24  options during the Trading Period, Plaintiffs suffered economic loss in the

25  approximate amount of $5 million compensable under the federal securities laws.

26  ///

27  ///

28

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder
### Against All Defendants

121. Plaintiffs repeat and reallege the allegations set forth in the preceding Paragraphs 1 through 120 as if fully set forth herein.

122. During the Trading Period, Defendants disseminated or approved the false and misleading statements and omissions specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

123. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

        (a)    employed devices, schemes and artifices to defraud;

        (b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs as a trader/seller of put options during the Trading Period.

124. Defendants further violated § 10(b) of the Exchange Act and Rule 10b-5 in that they violated their duty to abstain from trading on inside information. While in possession of material, non-public information, Defendants improperly sold 1,120,633 shares of Questcor stock for more than $40 million in illegal insider trading proceeds.

125. Plaintiffs have suffered damages in that, in reliance on Defendants' misrepresentations and the integrity of the market, they traded and sold put options for Questcor common stock at artificially inflated prices. Plaintiffs would not have sold the put options at the prices they sold, or at all, if they had been aware that the

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

market price had been artificially and falsely inflated by Defendants' misconduct.
As a direct and proximate consequence of Defendants' fraudulent conduct,
Plaintiffs were damaged in the approximate amount of $5 million, according to
proof at trial.

### COUNT II
**For Violation of Section 20(a) of the Exchange Act**
**Against Defendants Bailey, Mulroy, Cartt and Young**

126.   Plaintiffs repeat and reallege the allegations set forth in the preceding
Paragraphs 1 through 125 as if fully set forth herein.

127.   As set forth more fully above in ¶¶ 19-24 Defendants Bailey, Mulroy,
Cartt, and Young acted as controlling persons of Questcor within the meaning of
§20(a) of the Exchange Act.

128.   By virtue of their high-level positions within the Company providing
them with direct and supervisory involvement in its day-to-day operations,
ownership of Questcor stock, participation in bi-weekly senior leadership meetings,
awareness of the Company's finances and operations as demonstrated by their
public statements made on behalf of the Company, and intimate knowledge of the
false statements and omissions made by the Company and disseminated to the
investing public, Defendants Bailey, Mulroy, Cartt, and Young had the power and
authority to influence and control, directly or indirectly, the decision making of the
Company, including the manner and timing of the stock buyback and the content
and dissemination of the various statements identified herein which Plaintiffs
contend are false and misleading.  Defendants Bailey, Mulroy, Cartt, and Young
participated in conference calls with investors and were provided with or had
unlimited access to copies of the Company's reports, press releases, public filings
and other statements, alleged by Plaintiffs to be false and misleading, prior to
and/or shortly after these statements were issued and had the ability to prevent the
issuance of the statements or cause the statements to be corrected.  As set forth

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT

above, Defendants Bailey, Mulroy, Cartt, and Young violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act for the approximate $5 million in damages suffered by Plaintiffs according to proof at trial.

**COUNT III**
**For Fraud – Intentional Misrepresentation**
**Against All Defendants (California Law)**

129.   Plaintiffs repeat and reallege the allegations set forth in the preceding Paragraphs 1 through 128 as if fully set forth herein.

130.   During the Trading Period, Defendants disseminated to the public and/or approved of knowingly false and misleading statements as alleged above, and intentionally concealed the true facts necessary to provide an honest context for their public statements so that such statements would not be misleading.

131.   Defendants disseminated said false and misleading statements with the intent to deceive the investing public, including Plaintiffs, and induced Plaintiffs to trade and sell their put options during the Trading Period.

132.   Defendants knew their false and misleading statements were in fact false and misleading, or did not believe them to be true, or did not reasonably believe them to be true when made.  The true facts, which were known by the Defendants but concealed from the investing public, including Plaintiffs during the Trading Period, include, but were not limited to, the following:

(a)   Questcor lacked clinical data and scientific evidence to support the use of Acthar for indications other than IS, even as a "second-line" therapy.

(b)   Questcor had engaged in questionable tactics to promote the sale and use of Acthar in the treatment of MS and NS, including, but not limited to, the use of studies that were inherently flawed and did not support the conclusions for

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

1    which they were being used by Questcor's sales force.

2           (c)    Questcor lacked a reasonable basis to make positive statements

3    about the Company or its outlook, including statements about the effectiveness of

4    and potential market growth for Acthar.

5    133.   At the time these false and misleading statements were made by

6    Defendants, Plaintiffs was unaware of their falsity and believed them to be true.

7    Had Defendants not made the misrepresentations alleged herein, Plaintiffs would

8    not have traded and sold put options during the Trading Period, or at the prices

9    upon which they were traded or sold.

10   134.   Plaintiffs justifiably relied on the misrepresentations of facts made by

11   Defendants by trading and selling put options during the Trading Period.

12   135.   Plaintiffs' reliance on Defendants' misrepresentations as alleged herein

13   was a substantial factor in causing harm to Plaintiffs.

14   136.   As a direct and proximate consequence of Defendants' fraudulent

15   conduct, Plaintiffs were damaged in the approximate amount of $5 million

16   according to proof at trial.

17   137.   In doing the acts herein alleged, Defendants acted with malice,

18   oppression, and fraud in conscious disregard of Plaintiffs' rights, so as to justify an

19   award of exemplary and punitive damages in an amount appropriate to punish

20   Defendants and to deter others from engaging in similar conduct.

21                          **COUNT IV**
                      **For Fraudulent Concealment**
22                **Against All Defendants (California Law)**

23

24   138.   Plaintiffs repeat and reallege the allegations set forth in the preceding

25   Paragraphs 1 through 137 as if fully set forth herein.

26   139.   During the Trading Period, Defendants disseminated to the public

27   and/or approved of knowingly false and misleading statements as alleged above,

28   and Defendants intentionally concealed the material facts necessary to make such

GRADSTEIN &
MARZANO, P.C.
6310 San Vicente Blvd
Los Angeles, CA 90048

FIRST AMENDED COMPLAINT